Scott MAYO, et al., Plaintiffs,

v.

HARTFORD LIFE INSURANCE
CO., et al., Defendants.

No. Civ.A.H–01–2139.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 8, 2002.

Scott Monroe Clearman, Michael D. Myers, McClanahan & Clearman, Houston, TX, for Plaintiffs.

Barry A. Chasnoff, Akin Gump, et al., San Antonio, TX, for Hartford Life Insurance Co.

Michael M. Wilson, Clements, O'Neill, et al., Howard Kleinhendler, Myron Kirschbaum, Kaye, Scholer, et al., New York City, for Camelot Music, Inc. and TRA S World Entertainment Corp.,

Geoerge W. Bramblett, Jr., Haynes & Boone, Dallas, TX, Daniel M. McClure, Fulbright & Jaworski, Houston, TX, for Wal–Mart Stores, Inc.

Thomas Francis Hetherington, Bracewell & Patterson, Houston, TX, Paul A. Fischer, Jorden Burt, LLP, Washington, DC, James F. Jorden, Attorney at Law, Washington, DC, for AIG Life Insurance Co.

## MEMORANDUM AND ORDER

ATLAS, District Judge.

Pending before the Court is the Estate of Douglas Sims' Motion for Partial Summary Judgment, Defendant Wal–Mart's Response and Cross Motion for Summary Judgment, and the parties' various other submissions on this matter.[1] The Court has considered the parties' submissions, all matters of record, and relevant legal authorities, and concludes that the Sims Estate's Motion should be granted and Wal–Mart's Cross Motion should be denied.

### I. FACTUAL BACKGROUND

Douglas Sims was employed by Wal–Mart from May 1987 until his death on December 1, 1998.[2] Sims was not an officer of the company. He was not indebted to Wal–Mart at the time of his death.[3] He

---

1. *See* Plaintiff Estate of Sims Motion for Partial Summary Judgment ("Sims Estate's Motion") [Doc. # 97], Wal–Mart's Response to the Estate of Douglas Sims' Motion for Partial Summary Judgment ("Wal–Mart's Response") [Doc. # 110], the Affidavit of Tom Emerick ("Emerick Aff.") [Doc. # 115], Affidavit of Lee A. Nystrom ("Nystrom Aff") [Doc. # 116], Sims Estate's Reply Concerning Its Motion for Partial Summary Judgment ("Sims's Reply") [Doc. # 117], and Wal–Mart Defendants' (1) Reply to the Sims Estate's Reply Concerning its Motion for Partial Summary Judgment and (2) Cross Motion for Summary Judgment ("Wal–Mart's Reply" and "Wal–Mart Cross Motion," respectively) [Doc. # 122], The Sims Estate's Combined Sur-Re-

ply Concerning its Motion for Partial Summary Judgment and Response to Wal–Mart's May 16, 2002 "Cross Motion for Summary Judgment" ("Sims's Sur–Reply") [Doc. # 125], Wal–Mart Defendants' Reply to the Sims Estate's May 20, 2002 Briefs ("Wal–Mart's Further Response") [Doc. # 126].

2. *See* Emerick Aff., Exhibit A to Defendant Wal–Mart's Motion for Summary Judgment and Brief in Support [Doc. # 19] ("Wal–Mart's Original Summary Judgment Motion"); Wal–Mart Exhibits in Support of Defendant Wal–Mart's Motion for Summary Judgment [Doc. # 20].

3. *See* Exhibit A to Sims's Motion, ¶ 36.

was an associate who was paid an hourly wage for his work.[4]

Wal–Mart, through an entity it created in 1993, the Wal–Mart Stores, Inc. Corporation Grantor Trust (the "Wal–Mart Trust" or "Trust"), purchased almost 200,-000 corporate owned life insurance ("COLI") policies on the lives of its employees as of December 28, 1993. Wal–Mart and the Wal–Mart Trust purchased approximately 150,000 additional policies in 1994 and 1995. The Trust was named the beneficiary and owner of all these policies. The Wal–Mart Trust was established for the sole benefit of Wal–Mart and Wal–Mart completely controlled the Trust's affairs.[5] The COLI policy on Sims's life (the "Sims Policy") and many of the other COLI policies were purchased from AIG Life Insurance Company ("AIG").[6]

Wal–Mart, through the Trust, paid an annual premium of approximately $3,200 for the Sims Policy.[7].

On June 28, 2001, the Sims Estate filed a claim against Wal–Mart to recover the death benefits of approximately $64,000 due under the Sims Policy. The Sims Estate seeks a declaration that Wal–Mart had no insurable interest in Douglas Sims's life. The Sims Estate also seeks the remedy of imposition of a constructive trust over the money or other consideration that Wal–Mart received under the policy and monetary judgment in the Sims Estate's favor.[8] Wal–Mart filed a motion for summary judgment on September 7, 2001, contesting the application of Texas law and other aspects of the Sims Estate's claim. The Court issued a Memorandum Opinion on March 5, 2002 (the "March 5th Opinion"), and an Amended and Supplemented Memorandum Opinion on August 7, 2002, that denied with prejudice all Wal–Mart's original summary judgment arguments.

Plaintiff Sims Estate now seeks summary judgment for a declaration that Wal–Mart did not have an insurable interest in Douglas Sims's life. The Sims Estate does not seek a ruling on the remedy to be issued in the event that it prevails on its claim. Wal–Mart opposes Plaintiff Sims Estate's request and cross-moves for summary judgment in its own favor.

## II. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Baton Rouge Oil and Chemical Workers Union v. Exxon-Mobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to in-

---

**4.** *See* Exhibit B to Sims's Motion, ¶ 9.

**5.** *Id.* ¶ 8.

**6.** *Id.* ¶ 7.

**7.** This sum apparently does not account for the effect of loans that AIG allegedly made to Wal–Mart in connection with the COLI policies' purchase, or the tax effects, if any, of the transactions.

**8.** All money the Trust uses to pay premiums for the COLI insurance is received from either Wal–Mart or is proceeds of the COLI policies. Wal–Mart directs the Trust as to how the proceeds of the policies will be spent. *See* Trust Agreement, art. 1, *et seq.* (copy attached as Exhibit 10 to Affidavit of Tom Emerick ("Original Emerick Aff.")), Exhibit A to Defendant Wal–Mart's Motion for Summary Judgment [Docs. # 19, 20].

terrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Calbillo v. Cavender Oldsmobile, Inc.,* 288 F.3d 721, 725 (5th Cir.2002). An issue is material if its resolution could affect the outcome of the action. *Terrebonne Parish School Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir.2002) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In deciding whether a fact issue has been created, the facts and the inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Hotard v. State Farm Fire and Cas. Co.,* 286 F.3d 814, 817 (5th Cir.2002). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy—that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir.1999).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Smith v. Brenoettsy,* 158 F.3d 908, 911 (5th Cir. 1998). If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.

*Littlefield v. Forney Indep. Sch. Dist.,* 268 F.3d 275, 282 (5th Cir.2001). A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir.1998). Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this burden. *Id.* Instead, the nonmoving party must present specific facts which show "the existence of a 'genuine' issue concerning every essential component of its case." *Id.* A dispute about a material fact is genuine only if evidence is such that a reasonable jury could return a verdict for nonmoving party. *Littlefield,* 268 F.3d at 282. In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.1995), *revised on other grounds upon denial of reh'g,* 70 F.3d 26 (5th Cir.1995); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

## III. ANALYSIS

### A. The Proper Scope of the Texas [9] Insurable Interest Doctrine

Wal–Mart contends that Plaintiff improperly limits the scope of the Texas insurable interest doctrine. The Court agrees.

In this diversity case, the Court is required by *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938),[10] and to apply the substantive law

---

**9.** Wal–Mart reasserts its argument that Texas law does not apply. The Court has repeatedly rejected this argument and will not revisit the issue here.

**10.** *See General Acc. Ins. Co. v. Unity/Waterford–Fair Oaks, Ltd.,* 288 F.3d 651, 653 n. 4 (5th Cir.2002).

of the State of Texas (since Texas choice of law rules would require application of Texas, not Georgia law). Furthermore, under *Erie,* the Court "must attempt 'to rule the way the Texas Supreme Court would rule on the issue[s] presented.'" *Matador Petroleum Corp. v. St. Paul Surplus Lines Ins. Co.,* 174 F.3d 653, 656 (5th Cir.1999) (quoting *Hanson Prod.·Co. v. Americas Ins. Co.,* 108 F.3d 627, 629 (5th Cir.1997)); *accord Calbillo v. Cavender Oldsmobile, Inc.,* 288 F.3d 721, 729 (5th Cir.2002). In the absence of a ruling by the Texas Supreme Court on a particular issue, "it is the duty of the federal court to determine as best it can, what the highest court of the state would decide." *Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.,* 953 F.2d 985, 988 (5th Cir.1992). In making this determination, "[t]he decisions of lower state courts should be given some weight, but they are not controlling where the highest state court has not spoken on the subject." *Rogers v. Corrosion Prods., Inc.,* 42 F.3d 292, 295 (5th Cir. 1995) (citing *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967)), *cert. denied,* 515 U.S. 1160, 115 S.Ct. 2614, 132 L.Ed.2d 857 (1995).

■ Texas requires one insuring the life of another to have an insurable interest in the insured person's life. *Empire Life Ins. Co. of America v. Moody,* 584 S.W.2d 855, 859 (Tex.1979); *Drane v. Jefferson Standard Life Ins. Co.,* 139 Tex. 101, 161 S.W.2d 1057, 1058–59 (1942); *Cheeves v. Anders,* 87 Tex. 287, 28 S.W. 274, 275 (1894); *Tamez v. Certain Underwriters at Lloyd's, London,* 999 S.W.2d 12 (Tex. App.—Houston [14th Dist.] 1999, pet. denied); *Stillwagoner v. Travelers Ins. Co.,* 979 S.W.2d 354, 358 (Tex.App.—Tyler 1998, no pet.); *see DeLeon v. Lloyd's London,* 259 F.3d 344, 350 (5th Cir.2001). "[I]t is against the public policy of the State of Texas to allow anyone who has no insurable interest to be the owner of a

policy of insurance upon the life of a human being." *Griffin v. McCoach,* 123 F.2d 550, 551 (5th Cir.1941); *accord DeLeon,* 259 F.3d at 350; *Cheeves,* 28 S.W. at 275; *Tamez,* 999 S.W.2d at 16–17.

■ The Texas insurable interest doctrine was last discussed by the Texas Supreme Court in *Empire Life Ins. Co. of America v. Moody,* 584 S.W.2d 855, 859 (1979), quoting and adopting that same court's ruling in *Drane v. Jefferson Standard Life Ins. Co.,* 139 Tex. 101, 161 S.W.2d 1057, 1058–59 (1942). The Texas Supreme Court repeated the longstanding rule that a putative beneficiary or owner only has an insurable interest in the life of another where the beneficiary is "(1) so closely related by blood or affinity that he wants the other to continue to live, irrespective of the monetary considerations; (2) a creditor; [or] (3) one possessing a reasonable expectation of pecuniary benefit or advantage from the continued life of another." *Empire,* 584 S.W.2d at 859; *Drane,* 161 S.W.2d at 1058–59; *see also Tamez,* 999 S.W.2d at 17; *Stillwagoner,* 979 S.W.2d at 360–61; *DeLeon,* 259 F.3d at 350.

There is no dispute that the first two categories in *Drane* do not apply because Douglas Sims was neither related to nor indebted to Wal–Mart. The parties' motions address the scope of the third basis for an insurable interest under *Drane,* the requirement that the beneficiary or owner possess a reasonable expectation of pecuniary benefit or advantage from the continued life of another. *Drane,* 161 S.W.2d at 1059.

■ Plaintiff Sims Estate contends that this category does not apply to the Sims Policy because Douglas Sims was not a "key man" of Wal–Mart. Plaintiff's characterization of this third prong of the *Drane* test is potentially too narrow. The Texas Supreme Court in *Drane* elaborated on this category as follows:

Bluntly expressed, insurable interest under [the third] classification, is determined by monetary considerations, viewed from the standpoint of the beneficiary. Would he regard himself as better off from the standpoint of money, would he enjoy more substantial economic returns should the insured continue to live; or would he have more, in the form of the proceeds of the policy should he die.

*Drane*, 161 S.W.2d at 1059.[11] If the beneficiary "would profit by [the insured's] death, the policy contract is void as to [the beneficiary] since the public has a controlling concern that no person have an interest that may give rise to a temptation to destroy [the insured's] life." *Id.* The employee must be so valuable that others look to him or her primarily for the success of the business. *McBride v. Clayton*, 140 Tex. 71, 166 S.W.2d 125, 128–29 (1942); *see Tamez*, 999 S.W.2d at 18; *Stillwagoner*, 979 S.W.2d at 361. "The mere existence of an employer/employee relationship is never sufficient to give the employer an insurable interest in the life of the employee." *Stillwagoner*, 979 S.W.2d at 361; *see also Tamez*, 999 S.W.2d at 17–19; *Drane*, 161 S.W.2d at 1058–59; *accord DeLeon*, 259 F.3d at 350. No insurable interest exists if the loss arises *"from the cessation of ordinary service."* *McBride*, 166 S.W.2d at 129.

The traditional requirement in Texas that a beneficiary and owner of an insurance policy have an insurable interest as recognized by *Drane* was modified by the Texas Legislature. In 1921, the Legislature enacted article 5048 of the Texas Civil Statutes, which was recodified in 1951 as article 3.49 of the Texas Insurance Code. This provision provides that a corporation or other business may be named a beneficiary in any life insurance policy, and these beneficiaries have an insurable interest in the lives of their officers and stockholders. TEX.INS.CODE, art. 3.49 (Vernon 2000). In effect, article 3.49 allows a business to benefit from insurance on the lives of individuals that are deemed most significant to the business. The Legislature explicitly permitted these rights to apply to existing policies that already had designated the enumerated categories of people as beneficiaries. *Id.* This provision is significant for what it did not address: article 3.49 does not authorize companies and partnerships to be an owner of the policy. This statute is inapplicable in this case because Douglas Sims was not a stockholder, officer or partner of Wal–Mart.

The Texas Legislature enacted article 3.49–1 in 1953, a provision that remained unchanged until 1999. Article 3.49–1 provides that the insured person may designate or assign the beneficiary under the life insurance policy insuring that insured's life and the designated beneficiary will have an insurable interest under Texas law. TEX.INS.CODE, art. 3.49–1, §§ 1, 2. These provisions are inapplicable because Wal–Mart and the Trust, not the insureds (the employees), bought the policies and designated the Trust as beneficiary. In 1999, the Legislature amended article 3.49–1 to allow third parties to purchase or apply for new insurance on the lives of others, such as their employees, *if* the insured *consents in writing.* Acts of 1999,

---

**11.** The "key man" concept was recognized in Texas in 1921, prior to the *Drane* decision. The concept is that in certain limited circumstances, corporations or business entities may have an insurable interest in the lives of certain "key" persons within the company. The "key man" concept addresses officers and stockholders to whom the other stockholders look primarily for the success of the business or on whose services the corporation depends for its prosperity, and whose death will cause a substantial loss to it. *Stillwagoner*, 979 S.W.2d at 358; *see Tamez*, 999 S.W.2d at 18 n. 4. No party claims that Sims was a "key man" to Wal–Mart's operation.

76th Leg., Ch. 438, § 1. This expansion of the Texas insurable interest law applies only to the extent *the insured* designates in writing the third party to be the owner or the beneficiary. This provision applies only to policies applied for and purchased after January 1, 2000, and is not retroactive. The provision added for the 1999 Amendment thus is inapplicable.

Plaintiff contends that Sims was an hourly-wage employee whose life was insured only because he, like more than 350,000 other Wal–Mart employees, participated in Wal–Mart's medical plan.[12]

### B. *Application of the Texas Insurable Interest Doctrine to Sims*

Wal–Mart argues that if Texas law applies, Plaintiff has not met its summary judgment burden; that Wal–Mart had a pecuniary interest in the continued life of Sims and the other 350,000 COLI insureds; that the Texas insurable interest rule should not apply because the Texas public policy is not offended by the Wal–Mart COLI policies; and the statute of limitations bars the Sims estate's claim. These arguments will be addressed in turn.

#### 1. Plaintiff's Satisfaction of Its Summary Judgment Burden

Wal–Mart contends that Plaintiff is not entitled to a declaratory judgment at this time because Plaintiff offers insufficient facts to demonstrate that Wal–Mart lacked an insurable interest under Texas law. Specifically, Wal–Mart contends here that Plaintiff relies solely on the facts that Sims was an hourly wage employee, not an officer of the company, and was not indebted to Wal–Mart at the time of his death.

Wal–Mart points to the language in *Drane* stating that "insurable interest" includes "one having a reasonable expectation of pecuniary benefit or advantage from the continued life of another." *Drane*, 161 S.W.2d at 1059; *accord DeLeon*, 259 F.3d at 350. Without more explanation, Wal–Mart contends that Plaintiff "fails to offer any evidence that Wal–Mart did not have a reasonable expectation of pecuniary benefit or advantage from the continued life of Douglas Sims." [13] Wal–Mart's argument that Plaintiff's evidence is insufficient lacks merit.

As noted above, for the time period in issue, a company does not have an insurable interest in an employee's life in Texas, unless (i) either the employee is so valuable to the company that others look to him or her primarily for the success of the business, *McBride*, 166 S.W.2d at 128–29; *Drane*, 161 S.W.2d at 1058–59; *Tamez*, 999 S.W.2d at 18; *Stillwagoner*, 979 S.W.2d at 361; Tex.Ins.Code, art. 3.49, or (ii) the employee-insured designated the company as the beneficiary in writing, Tex.Ins.Code, art. 3.49–1, §§ 1, 2. Wal–Mart, acknowledging that the statute is inapplicable, urges the common law test has been met. Wal–Mart however ignores the stipulation by the Texas Supreme Court that no insurable interest exists if the loss arises *"from the cessation of ordinary service."* *McBride*, 166 S.W.2d at 129 (emphasis in original). "The mere existence of an employer/employee relationship is never sufficient to give the employer an insurable interest in the life of the employee." *Stillwagoner*, 979 S.W.2d at 361; *see Tamez*, 999 S.W.2d at 17–19.[14]

Wal–Mart's criticism of the Sims Estate's evidence also ignores the obvious.

---

**12.** *See* Exhibit C to Sims Estate's Motion.

**13.** Wal–Mart's Response, at 5–6.

**14.** Wal–Mart contends that the Court should not follow *Tamez* and *Stillwagoner* because

these rulings were not issued by the Texas Supreme Court. The Court deems these intermediate appellate rulings probative of Texas law, as has the Fifth Circuit. *See DeLeon*, 259 F.3d at 350. The Texas Supreme Court

Wal–Mart, a "mass merchandiser that operates retail discount stores in all 50 states,"[15] insured the lives of *350,000 employees*. Common sense dictates that not all 350,000 employees—some of whom left Wal–Mart's employ[16]—could have been individuals that the company looked to "primarily for the success of the business." Plaintiff's evidence is sufficient to establish entitlement to judgment as a matter law in the absence of presentation by Wal–Mart of proof that creates a genuine question of material fact about Sims's role at the company. Plaintiff has met its initial summary judgment burden and Wal–Mart's opposition on this ground is rejected.

### 2. Wal–Mart's Claimed Insurable Interest in the Life of Sims and Other COLI Insureds.

Wal–Mart alternatively contends that Plaintiff's request for summary judgment should be denied and Wal–Mart itself should be granted summary judgment because Wal–Mart can show that it had an "expectation of pecuniary benefits or advantage" from continuation of Sims's life, just as Wal–Mart had an interest in all the other insured employees' lives.[17] Wal–Mart urges, citing *Drane*, 161 S.W.2d at 1059, that whether Wal–Mart has such an insurable interest "is determined by monetary considerations, viewed from the standpoint of the beneficiary." Wal–Mart reasons further that if the beneficiary

would "regard himself as better off from the standpoint of money" and "enjoy more substantial economic returns should the insured continue to live," *id.*, than if the beneficiary received the policy proceeds should the insured die, then the beneficiary has an insurable interest in the insured.

The determination of this question in each case "must depend for its solution upon its particular facts." *Tamez*, 999 S.W.2d at 17 (citing *Drane*, 161 S.W.2d at 1059); *see McBride*, 166 S.W.2d at 130 ("Each case must stand or fall on its own peculiar facts under our well established definition of 'insurable interest.'"). Wal–Mart contends that the "particular facts of this case show that Wal–Mart had insurable interest in its insured employees, including Mr. Sims, who was valuable to Wal–Mart if he continued to live."[18] The Court disagrees.

### (a) Wal–Mart's Claimed Pecuniary Interest in the Continued Lives of the 350,000 COLI Insureds, Including Sims, Under the COLI Policies

■ Wal–Mart argues that Wal–Mart had "a reasonable expectation of pecuniary benefit or advantage from the continued life," rather than the death, of Douglas Sims. Wal–Mart asserts that it had an expectation of pecuniary benefit or advantage from the continued lives of "all of its employees, including Douglas Sims."[19]

declined to review the *Tamez* decision. *See* Plaintiff's Sur–Reply, Exhibits D, E, and F. These opinions adhere to longstanding Texas doctrine; they are not unreliable or alterations of Texas law.

**15.** Emerick Aff., ¶ 1.

**16.** *See* Nystrom Aff., ¶ 9.

**17.** For instance, in *Tamez*, the court held that article 3.49 was "inapplicable to the instant case" and then proceeded to determine whether the employer had a common law

insurable interest in the life of the employee. *Tamez v. Certain Underwriters at Lloyd's, London, Int'l Accident Facilities*, 999 S.W.2d 12, 18 n. 4 (Tex.App.—Houston [14th Dist.] 1999, pet. denied).

**18.** Wal–Mart Response, at 8.

**19.** *Id.* Wal–Mart explains:

Wal–Mart would not and did not profit by the death of its employees, including Douglas Sims. To the contrary, the death of Wal–Mart employees, including Douglas Sims,

Wal–Mart acknowledges that the "COLI policy on Douglas Sims was not purchased in isolation from the COLI policies on other employees," that the Sims Policy "was purchased by the Trust as part of a group of approximately 350,000 other employees between December 28, 1993 and June 1, 1995," and that these employees "represented a substantial proportion of the total work force of Wal–Mart at that time." [20] Indeed, the dependence of the Sims Policy on the other COLI policies Wal–Mart purchased is reflected in the fact that Wal–Mart could not cancel or surrender any single policy or any subset of the policies. [21]

In substance, Wal–Mart theorizes that because Sims was a Wal–Mart employee and because Wal–Mart's employees "as a group" were important to the company's profitability and to the continuing functioning of its business, Wal–Mart (through its Trust) has an insurable interest in Sims's life in conjunction with Wal–Mart's interest in the lives of the rest of the insured employees. This argument is nothing more than the proposition that a company may insure the lives of its employees for its business purposes. This argument has been rejected time and again by Texas courts. *See, e.g., McBride*, 166 S.W.2d at 128–29; *Tamez*, 999 S.W.2d at 18; *Stillwagoner*, 979 S.W.2d at 361. As noted above, "[t]he mere existence of an employer/employee relationship is never sufficient to give the employer an insurable interest in the life of the employee." *Stillwagoner*, 979 S.W.2d at 361; *see Tamez*, 999 S.W.2d at 17–19. No insurable interest exists if the loss arises *"from the cessation of ordi-*

*nary service." McBride*, 166 S.W.2d at 129. The Texas Legislature's "grant of insurable interest [by the predecessor of art. 3.49] extended only to the lives of officers and stockholders 'to whom the other stockholders looked primarily for the success of the business' or 'on whose services the corporation depends for its prosperity, and whose death will be the cause of a substantial loss to it.' " *Stillwagoner*, 979 S.W.2d at 361 (quoting *McBride*, 166 S.W.2d at 128–29).

Wal–Mart fails to identify Sims's specific importance to the company as a worker or in any other way, in comparison or contrast to the thousands of other employees (and executives) whose lives Wal–Mart also insured under the Wal–Mart COLI policies. Indeed, Wal–Mart cannot do so. Wal–Mart insured a substantial percentage of the Wal–Mart work force, which consisted of hundreds of thousands of employees, from December 1993 to June 1, 1995 merely because they were members of the Wal–Mart's group health plan and did not opt out of the coverage. Wal–Mart insured employees' lives without regard for the particulars of each employee's job, health or other characteristics. *See, e.g.,* Nystrom Aff., Exhibit 12; Emerick Aff., ¶¶ 2, 7. Wal–Mart has access to all necessary information about Sims's job duties, skills and value to the company, but makes no attempt to present evidence that Sims, individually, had any special characteristics that made him particularly valuable to the company.

---

would and did result in a financial loss to Wal–Mart. The financial success of Wal–Mart in terms of both revenues and profits depends heavily upon the continued lives and continued performance of Wal–Mart's work force. Wal–Mart's employees are crucial to the financial success of the company. It is noted that Wal–Mart, the company, is not the named beneficiary of the COLI policies; rather, it is the Trust that holds that designa-

tion with Wal–Mart as beneficiary of the Trust. For the purposes of the motions addressed here, the Court will ignore this distinction.

20. Emerick Aff., ¶ 7.

21. *See* AIG Letter of Understanding (Original Emerick Aff., Exhibit 12), at 2; Emerick Aff., ¶ 7.

Wal–Mart's argument that it had an insurable interest in Sims, as one of its 350,000 employees, is unsupported by Texas law and is rejected.

### (b) Wal–Mart's Claimed Expectation of Pecuniary Benefit from the Continued Lives of Each of Its Employees, Including Sims

■ Wal–Mart makes a closely related argument that it has demonstrated factually that it derived a pecuniary advantage from the continued life of all its employees, including Douglas Sims. Wal–Mart argues that the terms of the COLI policies and the associated AIG Letter of Understanding provided no financial incentive for the Trust or Wal–Mart to have the insureds die sooner rather than later.[22] In an attempt to raise a fact issue to defeat the Sims Estate's Motion, and to justify summary judgment in its own favor, Wal–Mart relies on the affidavit of its Vice President of Benefits, Tom Emerick, to contend that it had a specific and tangible expectation of financial and pecuniary interest in the continued lives of Sims and all its employees insured under the COLI policies. Emerick states the following in support of this theory:

(1) the cost of replacing the employee by advertising for a job opening, interviewing candidates, and then hiring a replacement employee,

(2) the loss of productivity of the working group that occurs upon the death of an experienced employee,

(3) the cost of training a new replacement employee,

(4) the cost under the Wal–Mart self-insured group health plan incurred when workers become ill

and die is substantially greater than those incurred by workers who do not die,

(5) the experience-rated increases in life insurance premiums for the company-paid life insurance,

(6) the cost of certain death-related costs paid for by Wal–Mart with a professional counseling service,

(7) the Special Death Benefit Wal–Mart committed for a few years to pay to those who permitted the COLI policies on their lives, and

(8) the case value build-up and tax deductions expected from the COLI policies.[23]

Wal–Mart also avers that its employees are not fungible, that they are extensively trained and that each year it "spends millions of dollars to train employees, and vast sums had been expended in training the existing work force as it existed at any point in time while the COLI policies were in effect".[24]

Wal–Mart's arguments, as noted earlier, are reminiscent of the employer defendant's (National Convenience Stores ("NCS")) arguments that the *Tamez* and *Stillwagoner* courts rejected on the basis of *McBride* and *Drane*.[25] In *Tamez* and *Stillwagoner*, NCS argued that the proceeds of the death policies on its employees was needed to defray actual expenses the company expected to incur when an employee died in the performance of his job. The *Stillwagoner* court noted that the company was merely insuring against the loss the company was likely to incur upon the employee's death, not the "loss at the death of the insured of the expectation of pecuniary benefit or advantage which initially gave rise to the insurable inter-

---

**22.** Wal–Mart Response, at 13; Nystrom Aff., ¶ 10.

**23.** Emerick Aff., ¶ 9.

**24.** Emerick Aff., ¶ 8.

**25.** *See also DeLeon,* 259 F.3d at 350 (acknowledging this holding of *Tamez* and *Stillwagoner* ).

est." 979 S.W.2d at 363. Thus, the *Still-wagoner* court looked for proof of some value to NCS that the employee, had he continued to live and work for the company, would have provided to the company. NCS provided no such proof. Similarly, the *Tamez* court recognized NCS's desire to insure against the risk of the employee's accidental on-the-job death, and NCS's intent to use the insurance proceeds to pay benefits to the decedent's family and to defend NCS against potential liability. 999 S.W.2d at 19. The court however held that "reimbursement of costs associated with defending against possible liability is [in reality] a benefit to NCS.... NCS would recover the proceeds whether or not it is liable for damages and regardless of the amount of the loss." *Id.* These rulings are consistent with the Texas Supreme Court's thinking in *Drane*, where the Court directed the analysis to be whether the beneficiary "would profit by [the insured's] death." *See Drane*, 161 S.W.2d at 1059. The Court thus focused on whether the beneficiary would receive money upon the insured's death in excess of the value to the beneficiary of the insured's continued life.

Wal–Mart's proof fails to create a genuine fact issue under the law of Texas. Wal–Mart's justifications for the COLI insurance all are to defray the costs of *replacing* the employee who dies (*e.g.*, advertising for a job opening, interviewing candidates, and then hiring a replacement employee; absorbing the loss of productivity of the working group that occurs upon the death of an experienced employee; the cost of training a new replacement employee; the costs under the self-insured group health plan when workers become ill and die; the experience-rated increases in life insurance premiums for the company-paid life insurance; the cost of certain death-related costs paid for by Wal–Mart for professional counseling services; and the Special Death Benefit Wal–Mart promised for a few years). Wal–Mart produces no evidence that it would benefit from *Sims's* continued employment by Wal–Mart, his specific personal services to the company, his business judgment, his wisdom, or his contacts.

Furthermore, Wal–Mart's arguments are premised, at least partially, on the assumption that a large group of employees would perish at the same time or at several points in time close together. There is no legal or factual basis for this premise. Wal–Mart provides no evidence that it genuinely expected a mass catastrophe in 1993–95, when it purchased the COLI policies, or thereafter. Indeed, Wal–Mart's own evidence demonstrates that it insured the lives of all employees and paid annual premiums on them irrespective of future or past employment considerations. Employees were included in the COLI policies or not without regard to whether the employees continued to work for the company after being insured, and without regard to the longevity of the employees' employment at the time Wal–Mart committed to the insurance on an employee's life. The Wal–Mart group health plan provided that a Wal–Mart employee could enroll (and thus become eligible to be insured for Wal–Mart's benefit under the COLI policy) if the employee had been an "active full-time hourly associate[ ] who ha[d] completed at least 90 days continuous full-time employment." [26] There was nothing as to the degree or type of training, skill or experience in similar jobs the employees had. Wal–Mart could not cancel any individual's policy until the insured died; Wal–Mart had to cancel all the poli-

---

**26.** Summary Plan Description ("SPD"), eff. Jan. 1, 1994 (Exhibit 1 to Original Emerick Aff.), at C–1.

cies or none.[27] Wal–Mart also submits no evidence as to the number or percentage of employees insured in the COLI policies that left Wal–Mart's employ, while remaining insureds. Thus, the COLI policies bore no relationship to the value of any particular employee *as an employee* to Wal–Mart.

The Court is entirely unpersuaded that Wal–Mart had an insurable interest in the lives of all its employees or of Sims in particular, as of the time it purchased the COLI policies or at any other time.

### (c) The *Smith* Opinions

Wal–Mart contends that the Texas Supreme Court would likely rule in its favor on the applicability of the insurable interest doctrine. Wal–Mart relies on the concurring and dissenting opinions in the recent case of *Certain Underwriters at Lloyd's London v. Smith*, 77 S.W.3d 859 (Tex.App.—Houston [14th Dist.] 2002, no pet.). These opinions take issue with Texas courts' traditional view of the law of "insurable interest" evidenced by the decisions in *Drane, McBride, Empire, Tamez* and *Stillwagoner*.[28] Wal–Mart ignores the majority decision in *Smith*, which adopted the reasoning of *Tamez*, a ruling by another panel of the same court. The justices in the majority in *Smith* were Justice Wanda Fowler, who wrote a detailed opinion, and Chief Judge Scott Brister, who issued a concurrence "reluctantly." Chief Justice Brister acknowledged that *stare decisis* applied and that *Tamez* governed the outcome of the case. Notably, the Texas Supreme Court declined to review the *Tamez* decision.[29] As in *Tamez*, the defendant NCS was trying to establish that the company had an insurable interest in the lives of employees insured under a group accidental injury and death policy the company had purchased naming itself as the beneficiary and owner.[30] Ultimately, the *Smith* ruling reaffirms that *Drane* and *Tamez* continue to reflect Texas law on the insurable interest doctrine to the extent the dispute does not involve circumstances governed by Texas statutes. The *Smith* decision was not appealed. The *Smith* concurrence and the dissent therefore are entitled no precedential value; they represent the individual views of two Texas judges. Wal–Mart's argument that the *Smith* case represents a binding—or even representative—explanation of the insurable interest doctrine is unfounded. If anything, *Smith* establishes that Texas courts continue to apply the traditional doctrine unless specifically directed by Texas statute that the doctrine does not apply.

### C. *Texas Public Policy*

■ Wal–Mart also contends that the actual policy underlying the Texas insur-

---

27. *See* AIG Letter of Understanding.

28. Wal–Mart especially focuses on the concurring opinion by Chief Judge Scott Brister in *Smith*, who writes that "Texas was the last state to limit insurable interests strictly to the boundaries of the common law" and that "the Texas Legislature has repeatedly expanded insurable interest far beyond those limits." *Smith*, 77 S.W.3d at 877. Wal–Mart also notes that Judge Charles Seymore, in a dissent in *Smith*, believed that the convenience store employer had an insurable interest in its employee on the basis of its Job Injury Benefit Program. He, too, thought that "employer-employee relations have changed in the last sixty years." *Id.* at 883.

29. It is interesting that the Texas Court of Appeals issued its ruling on April 25, 2002, five or more days after being notified that the parties had settled the dispute and that all that remained was a hearing to approve the settlement as to a minor.

30. Coincidentally, Justice Brister was the trial judge who granted summary judgment against the *Tamez* plaintiffs and was reversed by the Texas Fourteenth Court of Appeals.

able interest doctrine is not violated by the Wal–Mart COLI contracts because the Wal–Mart Insurance provided no incentive for Wal–Mart to hasten Sims's death, the reason generally offered by Texas courts for requiring that a beneficiary have an insurable interest in the life of the person insured. Wal–Mart contends that Texas public policy on insurable interest has not been rigidly enforced since various statutory changes limit the traditional rule on insurable interests. The Texas Legislature, by amending the Texas Insurance Code on two occasions, has restricted the application of the insurable interest doctrine to permit adult Texans to name their own beneficiaries in individual and group policies.[31]

Wal–Mart's arguments prove too much. The Texas Legislature has granted individuals the right to name their own beneficiaries and to approve third party ownership of insurance on their lives, but only when the individuals themselves make these selections and do so in writing. The Texas Legislature requires the insureds specifically to demonstrate their consent to both the existence of insurance on their lives and the particular beneficiary and owner designations.[32] The Legislature's expansion of individual rights is entirely different from the circumstances Wal–Mart tries to defend in this case.

Wal–Mart decided on its own, and for its own purposes, to insure the lives of a "substantial percentage of the total work force of Wal–Mart at th[e] time [it purchased the COLI insurance]."[33] Wal–Mart gave, at best, a mere suggestion to the employees at the outset of the program that insurance on the employees' lives was involved. Wal–Mart states that it sent a memorandum to "All Wal–Mart Location Managers" representing the "SUBJECT" to be "New Death Benefits."[34] Wal–Mart's explanation was vague. In the first several sentences in the first two paragraphs, Wal–Mart explained the $5,000 benefit being offered to the worker, not the insurance on the worker's life.[35] When Wal–Mart referred to

---

31. *See* TEX.INS.CODE, arts. 3.49–3.49–1.

32. *Id. See* Amended Opinion, at 25–27. These requirements apply whether or not the insurance is purchased by the insured individual or by a third party.

33. *See* Emerick Aff., ¶ 7.

34. Original Emerick Aff., ¶ 4 and Exhibit 7, at cover page. This is the initial announcement for benefits that Wal–Mart elsewhere referred to as "Special Death Benefits." Although Wal–Mart does not describe who "Location Managers" were, the Court assumes that this December 1993 memorandum was sent to each store and other location where Wal–Mart employees were worked. There is no concrete evidence that in fact the memorandum was received by all these managers, that they distributed the attached flyer, or that they discussed its contents with employees.

35. The memorandum directed the managers to distribute the flyer "by December 29, 1993 to all associates enrolled in the medical plan at your location for their review in order to meet legal notification requirements."

*Id.* The memo stated that Wal–Mart is "proud to announce the addition of a new death benefit" for "all active associates participating in the medical plan .... at no cost to associates." Wal–Mart simply stated to the managers that the new "benefit" was "being implemented because of financial benefits associated with Wal–Mart owned life insurance program which is explained in the enclosed [flyer]." *Id.* The memorandum also stated that "[i]t is important to tell associates [employees] that only those who do **not** wish to participate in this benefit need to return the information requested in the enclosed [flyer]." *Id.* The one page attached flyer explained in the first two paragraphs that Wal–Mart was offering each worker enrolled in the Wal–Mart benefits plan an additional benefit, namely, that each participating employee "will be automatically covered for additional death benefits"; that the death benefit would be $5,000 per employee, and an additional $5,000 for a death resulting from accident, that the benefit was payable to the worker's designated beneficiary on other insurance Wal–Mart would pay for on the

the insurance, the explanation was superficial, bare of any data or concrete information about the insurance. Wal–Mart has presented no evidence that its Location Mangers were able to answer employees' questions or could describe what the insurance program actually involved. Nor is there evidence of what managers did if workers asked questions that the managers could not answer reliably. Further, contrary to the intent of the Texas Legislature, there is no proof that Sims actually received the December 1993 flyer or any other notice about the insurance and the beneficiary designation prior to Wal–Mart's purchase of the COLI policy on his

> worker's life; that the benefit would cost the employee nothing; that "these new death benefits will be provided at no additional cost to associates and are in addition to any other life insurance you may have through Wal–Mart"; and that the "details of this new death benefit will be explained in the Benefits Book." *Id.*, Exhibit 7 (third page). Wal–Mart has not supplied any evidence that any more detail was ever provided to the workers. The SPD did not contain more information. *See* Original Emerick Aff., Exhibits 1 and 2, at pages F–2, respectively.

>> As the third paragraph in the flyer, Wal–Mart included the following statement: "Wal–Mart is providing these new death benefits as a result of financial gains from life insurance policies Wal–Mart will purchase which will cover the lives of associates who participate in the group health plan. That Wal–Mart owned life insurance will result in financial benefits for the corporation. Any net life insurance proceeds payable to Wal–Mart from this life insurance as a result of the death of an active associate will be contributed to the profit sharing plan."
>> The flyer then stated that the "new death benefits and the Wal–Mart owned life insurance will be automatic for associates enrolled in the group health plan. However, if *you do not wish to be covered by these programs*, please fill in the information below and return it to Wal–Mart's Benefits Department by January 31, 1994." The flyer then had an opt out form as follows:

life. Sims did not sign any agreement or consent—as required by the Texas statutes cited by Wal–Mart.[36] Wal–Mart did not explain the financial arrangements in writing or in plain English. Nor did Wal–Mart state that the company would have insurance on the employee's life whether or not the individual continued to work for Wal–Mart. Wal–Mart did not explain what advantages the company received when the policies were purchased while the employee was alive, or what the company received upon the employee's death. Wal–Mart has presented no evidence that its managers were able to address these issues.

> I do not wish to be covered by the new $5,000 death benefit nor the Wal–Mart owned life insurance policy.

> _____     _____
> Signature                Date

> _____
> Printed name

> _____
> Social Security Number

> Thus, Wal–Mart did not hide the fact that insurance would be involved, but did not explain the arrangement in any meaningful way, so that the employees could discern the implications necessary to make an informed decision about authorizing the coverage.

36. Because Wal–Mart's flyer only required that workers opt *out* of the plan, Wal–Mart eliminated any way to obtain definitive evidence that a particular worker received the flyer, let alone understood it. Wal–Mart supplies no evidence that any employee was given a meaningful explanation of the program. Approximately 1,000 employees out of 350,-000 in fact opted out.

> Wal–Mart does not meaningfully argue that Sims consented in writing to Wal–Mart or the Trust named as a beneficiary on a life insurance policy. Wal–Mart does argue that art. 3.49–1 would be sufficient to give Wal–Mart an insurable interest in his life, but fails to acknowledge that the Legislature did not make the statute retroactive. *See, e.g.,* Tex.Ins.Code, art. 3.49–1; Acts of 1999, 76th Leg., Ch. 438, § 1, making 1999 amendment effective Jan. 1, 2000.

In sum, Wal–Mart's evidence does not support the proposition that Wal–Mart advances that its COLI policies are consistent with Texas public policy as evidenced by Texas statutes that permit the employees an informed choice as to whether to agree to the insurance, the designation of the company as the beneficiary and the company as owner.

Wal–Mart also asserts that it had moral, ethical and legal restraints that prevent it from actually trying to take the lives of its insured employees or former employees, noting that article 21.23 of the Texas Insurance Code provides that a beneficiary who participates directly or indirectly in bringing about the death of the insured shall forfeit the proceeds. *See* Emerick Aff., ¶ 4. Wal–Mart misses the point here. The Texas insurable interest doctrine is based on principles and human tendencies generally that the courts and Legislature apparently believed historically existed. The question is not whether Wal–Mart specifically would want to murder the insureds. Under the law, a court does not have the prerogative to assess each beneficiary's subjective intent to determine as a specific factual matter whether the beneficiary in fact wanted to harm the insured under a particular insurance policy.

Wal–Mart has not produced evidence that the Texas public policy on insurable interests permits Wal–Mart's COLI policies.[37]

### D. *Statute of Limitations*

Wal–Mart argues that the claim of Plaintiff Sims Estate is barred by the statute of limitations. Wal–Mart joined Defendant AIG in pressing this issue in connection with the original motions for summary judgment. *See* March 5th Opinion, at 56–61 & n. 113; Amended Opinion, at 76–81 & n. 183. The Court rejected this contention and will not address the issue again.

## IV. *INTERLOCUTORY APPEAL*

The Court finds that the issue of whether Wal–Mart has an insurable interest in Sims' life addressed in this Memorandum and Order involve controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal of these rulings may materially advance the ultimate termination of this litigation. A separate Order addressing the Court's reasoning on this matter will be issued.

## V. *CONCLUSION*

For the foregoing reasons, the Court concludes that the Sims Estate's Motion for Partial Summary Judgment should be granted, and Wal–Mart's Cross Motion for Summary Judgment should be denied. It is therefore

**ORDERED** that The Estate of Douglas Sims's Motion for Partial Summary Judgment [Doc. # 97] is **GRANTED**. It is further

---

**37.** Wal–Mart argues that several Texas cases have recognized that article 3.49–1 undermines the policies underlying Texas's insurable interest requirements. *See, e.g., Kennedy v. Laird,* 503 S.W.2d 664, 665 (Tex.Civ.App.—Houston [1st Dist.] 1973, no writ) (observing that prior to enactment of art. 3.49–1, Texas was the only state not allowing an insured to name any beneficiary he chose and indicating that public policies underlying this rule are no longer realistic or necessary); *Henry v. Lin-*coln *Income Life Ins. Co.,* 405 S.W.2d 167, 169 (Tex.Civ.App.—Fort Worth 1966, no writ) (citing art. 3.49–1 and holding that "[i]t is not against public policy for a person with no insurable interest to be named beneficiary"). However, these decisions do not support the ultimate relief Wal–Mart seeks. Wal–Mart relies on *dicta* in these cases and neither of these courts addressed or reached the results that Wal–Mart advocates here. These decisions are inapposite.

**ORDERED** that Defendant Wal–Mart's Reply and Cross Motion for Summary Judgment [Doc. # 122] is **DENIED.**