WAL–MART STORES, INC., and Wachovia Bank of Georgia, N.A., in its capacity as Trustee of the Wal–Mart Stores, Inc. Corporation Grantor Trust, Plaintiffs,

v.

AIG LIFE INSURANCE COMPANY; Hartford Life Insurance Company; Westport Management Services, Inc.; International Corporate Marketing Group, LLC; National Benefits Group, Inc., d/b/a Marsh Financial Services; Seabury & Smith, Inc., Marsh, Inc., and Marsh & McLennan National Marketing Corporation, now known as J & H Marsh & McLennan Private Client Services, Inc., Defendants.

C.A. No. 19875.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 24, 2005.
Decided: April 1, 2005.

Robert K. Payson, Gregory A. Inskip, Potter Anderson & Corroon, L.L.P., Wil-

mington, DE; Michael Y. Horton, David S. Cox, Morgan Lewis & Bockius, L.L.P., Los Angeles, CA; Paul A. Zevnik, Morgan Lewis & Bockius, L.L.P., Washington, DC, for Plaintiffs.

Richard D. Heins, Carolyn Hake, Ashby & Geddes, Wilmington, DE; James F. Jorden, Paul A. Fischer, Kristin A. Shepard, Jorden Burt, L.L.P., Washington, DC, for Defendant AIG Life Insurance Co.

Harry Tashjian, IV, Richards Layton & Finger, Wilmington, DE; Barry A. Chasnoff, John Gillard, Akin Gump Strauss Hauer & Feld, L.L.P., San Antonio, TX; Michael Quigley, Jeffrey P. Kehne, Akin Gump Strauss Hauer & Feld, L.L.P., Washington, D.C., Michael Small, Esquire, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, CA, for Hartford Life Insurance Company and International Corporate Marketing Group.

Elizabeth A. Wilburn, Blank Rome, L.L.P., Wilmington, DE; Ian M. Comisky, Roger F. Cox, Blank Rome, L.L.P., Philadelphia, PA, for Defendant National Benefits Group, Inc.

Edward P. Welch, Seth M. Beausang, Skadden Arps Slate Meagher & Flom, L.L.P., Wilmington, DE; Marco E. Schnabl, Michael S. Davi, Skadden Arps Slate Meagher & Flom, L.L.P., New York City, for Defendants Marsh Financial Services, Seabury & Smith, Inc., Marsh, Inc., and Marsh & McLennan National Marketing Corporation, formerly known as J & H Marsh & McLennan Private Client Services, Inc.

### OPINION AND ORDER

LAMB, Vice Chancellor.

### I.

In the early 1990s, a large national retailer embarked on a plan to acquire corporate-owned life insurance ("COLI") policies covering an enormous number of its employees. The principal purpose of this plan was to generate substantial federal income tax benefits for the retailer. Working with a number of insurance brokers and insurers, the retailer began purchasing blocks of policies in 1993 and continued these purchases until 1995. By then, the retailer owned life insurance policies covering hundreds of thousands of its employees.

In 1996, Congress enacted legislation that effectively eliminated the future tax benefits associated with all but a few of the retailer's COLI policies. Soon thereafter, the Internal Revenue Service (the "IRS") began to bring enforcement actions claiming that employers participating in COLI plans, including the retailer, underpaid past taxes. Moreover, employees and the estates of deceased employees filed litigation claiming that the proceeds of any policies should be paid to them, rather than to the retailer. In the face of these developments, the retailer began to unwind its insurance policies in 1996. In 2002, it settled with the IRS.

In September of 2002, nearly a decade after making its first COLI investment, the retailer brought suit against all the parties involved in its purchase of these policies. Its complaint alleges a broad range of legal and equitable claims against the insurance brokers and providers—all seeking to recover from them the losses it incurred in connection with this risky tax avoidance scheme. On consolidated motions to dismiss brought by the insurers and brokers, the court concludes that the retailer has failed to state a claim upon which relief can be granted. The court, therefore, grants the defendants' motions to dismiss.

### II.

#### A. *The Parties*

Plaintiff Wal–Mart Stores, Inc. ("Wal–Mart Stores"), a Delaware corporation, is a

"large and sophisticated" retail sales company with over 1 million employees.[1] Plaintiff Wachovia Bank of Georgia, N.A. is the trustee of the Wal–Mart Stores, Inc. Corporation Grantor's Trust (the "Wal–Mart Trust").[2] The Wal–Mart Trust was set up in December of 1993 for the sole purpose of facilitating the COLI plans that are at the heart of this case. Starting in December of 1993, Wal–Mart purchased COLI policies from defendants AIG Life Insurance Company ("AIG") and Hartford Life Insurance Company ("Hartford") (collectively, the "Insurers").

Defendant Westport Management Services, Inc. ("Westport"), a Delaware corporation, and defendant International Corporate Marketing Group, LLC ("ICMG"), a Delaware limited liability company acted, respectively, as representatives of AIG and Hartford in connection with the COLI policies that are the subject of this action.

Defendants Seabury & Smith, Inc., Marsh Financial Services, Marsh, Inc., and Marsh & McLennan National Marketing Corporation[3] (collectively, the "Marsh Entities") and National Benefits Group, Inc. ("NBG," together with the Marsh Entities, the "broker-defendants") are insurance brokers who worked with Wal–Mart in soliciting and evaluating COLI proposals from a number of insurance companies.[4]

### B. *The COLI Policies*

In the early 1990s, Wal–Mart Stores, like other large employers at that time, began considering the acquisition of broad-based COLI plans. Broad-based COLI plans are life insurance policies purchased by a corporate employer covering the lives of a large number of employees.[5] The fundamental purposes of the COLI plans, according to Wal–Mart, were: (i) to provide certain free death benefits to classes of employees at Wal–Mart; (ii) to provide financial benefits to Wal–Mart in order to compensate the company for costs related to the death of employees; and (iii) to provide tax benefits to the company in connection with funding the premiums and other costs of the policies.[6] Under the COLI plans, the corporate employer secures loans from the insurers to fund the insurance premiums and then deducts the interest paid on those loans from its income taxes, thereby enjoying the investment return on these policies tax-free.

In mid–1993, Wal–Mart hired the broker-defendants to advise the company in connection with the purchase of the COLI policies. Specifically, Wal–Mart alleges that it hired the broker-defendants to "oversee[ ] the design and structure of an appropriate broad-based COLI plan for Wal–Mart, prepare[ ] questions for, and

---

**1.** Am. Compl. ¶¶ 1, 29. For the purposes of the pending motions to dismiss, the court takes the well-pleaded factual allegations of the complaint as true.

**2.** For simplicity, the court refers to plaintiffs Wal–Mart Stores and the Wal–Mart Trust collectively as "Wal–Mart."

**3.** On September 20, 2002, J & H Marsh & McLennan Private Client Services, formerly known as Marsh & McLennan National Marketing Corporation, was dissolved.

**4.** The Marsh Entities are Delaware corporations with their principal places of business in

New York, New York. NBG is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.

**5.** The COLI plans are modeled on "key man" life insurance policies used by corporations for decades to lessen the costs incurred when key employees died. The broad-based COLI plans extend the practice to insure broader classes of corporate employees. Am. Compl. ¶ 21.

**6.** *Id.* ¶ 3.

solicit[ ] proposals from, insurance companies involved in such COLI plans, select[ ] the appropriate insurance company or companies to underwrite the COLI plans, and negotiate[ ] the best available terms and conditions for Wal–Mart." [7] Wal–Mart eventually entered into written agreements with the broker-defendants "to administer and service the [COLI plans] and provide certain other [s]ervices." [8]

On December 28, 1993, after working with the defendant-brokers for several months, Wal–Mart purchased a block of more than 20,000 COLI policies from Hartford [9] and a block of nearly 200,000 COLI policies from AIG. The initial premium payments for these two blocks of COLI policies exceeded $800 million. Wal–Mart made five subsequent purchases from AIG, from June of 1994 through July of 1995, adding approximately 135,000 policies and approximately $300 million in initial premium payments. In total, Wal–Mart acquired approximately 350,000 COLI policies. Wal–Mart acquired these policies through the Wal–Mart Trust, a Georgia entity that was created specifically to take advantage of Georgia law that recognize employers' "insurable interests" in the lives of corporate employees. [10]

## C. Congress Changes The Law And The IRS Acts

In August 1996, Congress enacted the Health Insurance Portability and Accountability Act ("HIPAA") which, among other things, eliminated interest deductions (as of January 1, 1996) on COLI loans and on borrowings to fund COLI plans adopted after June 20, 1986, with transitional relief provided for 1997 and 1998 for up to 20,000 policies. [11] Within a few months, Wal–Mart began unwinding the COLI plans and, by January of 2000, its last COLI policies were canceled.

In 1997, the IRS initiated enforcement actions against a number of employers who had claimed tax deductions for interest on loans under COLI plans for tax periods before 1996. [12] Additionally, in 1998 and 1999, the IRS issued Technical Advisory Memoranda presenting its legal opinion on COLI plans and declaring that the interest deductions should be disallowed because they lack economic substance. [13] The IRS challenged the Wal–Mart COLI program, and Wal–Mart settled with the IRS in August of 2002. [14]

Also, starting in 2001, employees and estates of deceased employees began challenging the COLI plans, arguing that employers do not have "insurable interests"

---

7. *Id.* ¶ 29.

8. *Id.* ¶¶ 39, 43.

9. These policies covered the "managerial group" and provided higher policy limits than the policies purchased from AIG. *Id.* ¶ 42(a).

10. *Id.* ¶ 37.

11. Am. Compl. ¶ 46.

12. *See Am. Elec. Power Co., Inc. v. United States,* 136 F.Supp.2d 762 (S.D.Ohio 2001), *aff'd,* 326 F.3d 737 (6th Cir.2003) (upholding IRS disallowance of interest deductions on loans made against COLI policies); *In re CM Holdings, Inc.,* 254 B.R. 578 (D.Del.2000),

*aff'd,* 301 F.3d 96 (3d Cir.2002) (upholding bankruptcy claim for unpaid taxes); *Winn-Dixie Stores, Inc. v. Comm. of Internal Revenue,* 113 T.C. 254, 1999 WL 907566 (1999), *aff'd,* 254 F.3d 1313 (11th Cir.2001) (upholding disallowance of interest and administrative expense deductions).

13. Tech. Adv. Mem. 9812005 (Mar. 20, 1998) (available without pagination at 1998 WL 123675); Tech. Adv. Mem. 199901005 (Jan. 8, 1999) (available without pagination at 1999 WL 5679).

14. Wal–Mart claims that it is not seeking recovery for the "substantial unanticipated tax liability" from its settlement with the IRS. Am. Compl. ¶ 49.

in their lives under applicable state law.[15] Several actions were filed challenging the notion that Wal–Mart has an "insurable interest" in the lives of its deceased employees and demanding that courts impose a constructive trust on death benefits that Wal–Mart may have received under the COLI policies. In at least one action, a federal court in Texas applied Texas law instead of Georgia law in holding that Wal–Mart did not have an "insurable interest" in the lives of its Texas employees.[16]

## D. *Wal–Mart's Claims*

On September 3, 2002, nearly nine years after it began purchasing COLI policies, Wal–Mart filed this action to recover its losses resulting from the failed COLI program. Wal–Mart claims that since the COLI policies "failed in their fundamental purpose," namely, to secure substantial financial benefits for Wal–Mart, the parties involved in Wal–Mart's purchase of the COLI policies should share in the loss. Wal–Mart does not argue that the failure of its COLI program is due to the 1996 change in the tax code. Instead, Wal–Mart alleges that the failure of the COLI program is:

> [T]he product of risks never contemplated by the parties, *i.e.:* (i) the disallowance of interest deductions under pre-HIPAA federal tax law and (ii) attacks on the COLI plans mounted by the estates of insured that have been predicated on Wal–Mart's alleged lack of "insurable interest" in the lives of its employees.... [17]

Wal–Mart asserts that the defendants owed it the "highest duties of care, including a duty of good faith, a duty of full disclosure, a duty of loyalty, and a duty to meet the exacting standards of their respective professions." [18] Wal–Mart alleges that the defendants breached their fiduciary duties in "developing, promoting, recommending, advising, selling, and administering" the COLI plans.[19] Furthermore, Wal–Mart argues that had certain disclosures been made it would not have entered into the COLI plans. Predictably, Wal–Mart alleges that the defendants did not disclose the "full range and magnitude" of the risks involved in the COLI plans.[20] Wal–Mart complains that it relied to its detriment on the defendants in their alleged roles as fiduciaries, experts, advisors, agents, and providers of the COLI plans.

The Amended Complaint is set out in seven counts. Count 1 alleges unjust enrichment and restitution against all the defendants. Count 2 alleges breach of fiduciary duty against all the defendants. Count 3 alleges equitable fraud against all the defendants. Count 4 alleges breach of contract against all the defendants. Count 5 alleges negligence against the broker-defendants. Count 6 alleges violation of the Delaware Consumer Fraud Act against all the defendants. Finally, Count 7 seeks a declaration against all the defendants requiring the defendants to compensate Wal–Mart for any future losses incurred due to the failed COLI plans, including the

---

**15.** *Id.* ¶ 7.

**16.** *Mayo v. Hartford Life Ins. Co.,* 220 F.Supp.2d 794 (S.D.Tex. Aug.8, 2002), *aff'd,* 354 F.3d 400, 2004 WL 14654 (5th Cir. Jan. 5, 2004).

**17.** Answering Br. of Wal–Mart Stores, Inc. in Opp'n to AIG's and Hartford's Mot. to Dismiss the Am. Compl. ¶ 11.

**18.** Am. Compl. ¶ 54.

**19.** *Id.*

**20.** *Id.* ¶¶ 80(a)-(c).

costs that may be incurred from the "insurable interest" litigation.

In November of 2003, the defendants moved to dismiss the Amended Complaint based on (i) failure to state a claim upon which relief can be granted, and (ii) that the claims were untimely. This court dismissed all claims in the Amended Complaint as time-barred, without addressing the remaining arguments.[21] On November 4, 2004, the Delaware Supreme Court reversed and remanded.[22] The defendants have now renewed their motion to dismiss for failure to state a claim. On February 24, 2004, the court heard oral arguments.

## III.

■ The standard for dismissal pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted is well established. The motion will be granted if it appears with reasonable certainty that the plaintiff could not prevail on any set of facts that can be inferred from the pleading.[23] In considering a motion to dismiss under Rule 12(b)(6), the court is required to assume the truthfulness of all well-pleaded allegations of fact in the complaint.[24] All facts of the pleadings and inferences that can reasonably be drawn therefrom are accepted as true.[25] However, neither inferences nor conclusions of fact unsupported by allegations of specific fact are accepted as true.[26] That is, a trial court need not blindly accept as true all allega-

tions, nor must it draw all inferences from them in the plaintiffs' favor unless they are reasonable inferences.[27]

## IV.

### A. *Unjust Enrichment*

■ Wal–Mart's first claim is based in quasi-contract for unjust enrichment and restitution. Wal–Mart claims that the COLI plans failed in their fundamental purpose and that, as a result, Wal–Mart suffered substantial losses. Wal–Mart also contends that the defendants made substantial profits from the premiums and service fees Wal–Mart paid, and that it would be "unjust and unconscionable for the defendants to continue to retain the benefits conferred on them by Wal–Mart."[28] In other words, because the 2002 IRS settlement caused Wal–Mart to lose the benefit of most of the tax deductions it took in the early years of its COLI program, it now seeks to shift to the defendants its COLI-related losses—at least to the extent of the defendants' profits from the COLI contracts. The question presented is whether theories of unjust enrichment or quasi-contract are available to Wal–Mart to reallocate the risk among parties to the COLI contracts. Because Wal–Mart's failure to gain the advantages it sought when it entered into the COLI contracts was the result of obvious risks, plainly known to the parties at the time of contracting, Wal–Mart's complaint does

**21.** *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.,* 2004 WL 405913, at *7, 2004 Del. Ch. Lexis 19, at *3–4 (Del.Ch. Mar. 2, 2004).

**22.** *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 314 (Del.2004) (per curiam).

**23.** *Kohls v. Kenetech Corp.,* 791 A.2d 763, 767 (Del.Ch.2000).

**24.** *Grobow v. Perot,* 539 A.2d 180, 188 n. 6 (Del.1988).

**25.** *Id.*

**26.** *Id.*

**27.** *In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 727 (Del.Ch.1999).

**28.** Am. Compl. ¶ 85.

not state a claim for relief under those theories. Instead, the risk of loss must remain where it began, with Wal–Mart.

■ Wal–Mart, in the alternative, pleads both a claim for breach of contract and a claim for unjust enrichment. In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that clearly controls.[29] It is undisputed that a written contract existed between Wal–Mart and the Insurers to provide the COLI policies. The COLI policies, like all insurance policies, were reduced to written documents. Furthermore, the case for dismissing Wal–Mart's unjust enrichment claim is bolstered by the fact that the written contract contains a merger clause, expressly disavowing that any additional promises or agreements exist between the parties.[30]

■ Notwithstanding the existence of these contractual relationships, Wal–Mart attempts to plead facts sufficient to show that, in light of the doctrine of commercial frustration, no valid or enforceable con-

tracts govern its relations with the defendants. Under that doctrine, after a contract is made, if a party's principal purpose is substantially frustrated (without its fault) by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made, then the party's remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.[31] Wal–Mart pleads that the primary purpose of the COLI contract was to provide tax benefits to Wal–Mart through, *inter alia,* the deductibility of "interest payments made by Wal–Mart on policy-based loans from the insurer defendants[.]"[32] Wal–Mart also pleads that this purpose was frustrated by the IRS's disallowance of the deductions associated with the COLI plans.[33]

### 1. *Commercial Frustration*

■ The Delaware Supreme Court has adopted the doctrine of commercial frustration, but has not clearly defined its contours.[34] From a review of cases from other jurisdictions, however, several broad generalizations can be made. First, the defense of commercial frustration is very difficult to invoke, as courts have been extremely reluctant to allow parties to disavow obligations that they have agreed to.[35] Second, commercial frustration is a

---

**29.** *Rossdeutscher v. Viacom, Inc.,* 768 A.2d 8, 24 (Del.2001) (applying New York law); *ID Biomedical Corp. v. TM Technologies, Inc.,* 1995 WL 130743, at *15 (Del.Ch. Mar. 16, 1995) (applying Delaware law).

**30.** *See* Letter of Understanding at 2, Ex. 1 to Def.'s Joint Supplemental Br. The complaint makes reference to the Letter of Understanding, Am. Compl. ¶ 80(e), so this document is properly before the court on a motion to dismiss.

**31.** *Williams Nat. Gas Co. v. Amoco Prod. Co.,* 1991 WL 58387, at *13, 1991 Del. Ch. Lexis 73, at *40–*41 (Del.Ch. Apr. 16, 1991) (apply-

ing Kansas law and quoting *Columbian Nat'l Title Ins. Co. v. Township Title Serv., Inc.,* 659 F.Supp. 796, 804 (D.Kan.1987)).

**32.** Am. Compl. ¶¶ 3–4.

**33.** Am. Compl. ¶ 7.

**34.** *Martin v. Star Pub'g Co.,* 126 A.2d 238, 242 (Del.1956).

**35.** *See, e.g., Sage Realty Corp. v. Jugobanka, D.D.,* 1997 WL 370786, at *2, 1997 U.S. Dist. Lexis 9301, at *6 (S.D.N.Y. July 2, 1997) ("Application of the commercial frustration doctrine has been limited to instances where

question of law that is to be determined by the court.[36] Third, the party's main purpose must be completely, or nearly completely, frustrated.[37] Fourth, the doctrine of commercial frustration operates to excuse the performance of a contract, *not* to compel performance by another party; i.e. the doctrine can only be used as a shield, and not as a sword.[38] Fifth, the doctrine of commercial frustration does not apply if at the time of contracting the supervening event was reasonably foreseeable, and could (and should) have been anticipated by the parties and provided for in the contract.[39]

 The court concludes that the doctrine of commercial frustration does not apply in this case. First, Wal–Mart does not plead sufficient facts from which the court may reasonably infer that the main purpose of the COLI plans has been substantially frustrated. Wal–Mart alleges that there were three fundamental purposes of the COLI plans: (i) to provide

---

a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party.") (applying New York Law) (quotations omitted); *Bartlett Commons Shopping Ctr. v. Schultz Sav–O–Stores, Inc.*, 1992 WL 345052, at *1, 1992 U.S. Dist. Lexis 17334, at *2 (D.Ill. Nov. 12, 1992) ("[T]he doctrine of 'commercial frustration' or 'commercial impracticability' as an extension of the contract defense of impossibility of performance ... is not to be applied liberally....").

**36.** *See Peoplesoft U.S.A., Inc. v. Softeck, Inc.*, 227 F.Supp.2d 1116, 1119 (N.D.Cal.2002) ("The excuse of commercial frustration is a question of law, to be determined by the court from the facts of the case."); *Scottsdale v. Plitt Theatres, Inc.*, 1999 WL 281085, at *3, 1999 U.S. Dist. Lexis 7785, at *9–*10 (N.D.Ill. Mar. 31, 1999) ("The foreseeability of the frustrating event is a question of law to be resolved by the court.... The court must also determine whether the value of counter-performance has been destroyed by the frustrating event."); *Voyager Communications V, Inc. v. HMW Communications*, 1996 U.S. Dist. Lexis 14447, at *6–*7 (E.D.N.C. Aug. 21, 1996) (dismissing a claim for restitution based on commercial frustration on the pleadings).

**37.** *Peoplesoft*, 227 F.Supp.2d at 1119 ("In applying the frustration excuse, courts look first to see whether the *fundamental reason* of both parties for entering into the contract has been frustrated by an unanticipated supervening circumstance ....") (emphasis added); *Scottsdale*, 1999 WL 281085, at *3, 1999 U.S. Dist. Lexis 7785, at *9 ("To successfully plead commercial frustration, a defendant must allege that ... the value of counter-performance had been totally or nearly totally destroyed by the frustrating cause."); *Sage Realty*, 1997 WL 370786, at *2, 1997 U.S. Dist. Lexis 9301, at *6 ("Application of the commercial frustration doctrine has been limited to instances where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party.") (quotations omitted).

**38.** *See Voyager*, 1996 U.S. Dist. Lexis 14447, at *5; *see also* Restatement (2d) of Contracts, § 265 ("Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, *his remaining duties to render performance are discharged,* unless the language or the circumstances indicate the contrary.") (emphasis added).

**39.** *Williams Nat. Gas*, 1991 WL 58387, at *13, 1991 Del. Ch. Lexis 73, at *43 (citations omitted); *see also Peoplesoft*, 227 F.Supp.2d at 1119 ("To excuse nonperformance of a contract on the ground of commercial frustration ... the event must be of a nature not reasonably to have been foreseen...."); *Scottsdale*, 1999 WL 281085, at *3, 1999 U.S. Dist. Lexis 7785, at *9 ("To successfully plead commercial frustration, a defendant must allege that the frustrating event was not reasonably foreseeable and that the value of counter-performance had been totally or nearly totally destroyed by the frustrating cause."); *Sage Realty*, 1997 WL 370786, at *2, 1997 U.S. Dist. Lexis 9301, at *6 ("If a contingency is reasonably foreseeable and the agreement nonetheless fails to provide protection in the event of its occurrence, the defense of commercial frustration is not available.").

certain free death benefits to classes of employees of Wal–Mart; (ii) to provide financial benefits to Wal–Mart in order to compensate the company for costs related to the death of employees; and (iii) to provide tax benefits to the company in connection with funding the premiums and other costs of the plans.[40] Wal–Mart alleges that that the second and third purposes, providing Wal–Mart with financial benefits and with tax breaks, failed. However, Wal–Mart does not allege that the first purpose failed. In fact, Wal–Mart specifically alleges that due to the COLI plans, Wal–Mart's employees have received substantial death benefits.[41] Therefore, the invalidation of the tax deductions was not a "cataclysmic" event that rendered the policies "valueless" and the doctrine of commercial frustration does not apply.

Second, Wal–Mart is *not* attempting to use the doctrine of commercial frustration to excuse its non-performance. Wal–Mart is either attempting to compel some different performance or, more exactly, avoid the contract all together, due to commercial frustration. In either instance, the doctrine is inapplicable. It *only* applies to excuse future non-performance.

Third, both the invalidation of the tax deduction by the IRS and the invalidation of Wal–Mart's claim to having an insurable interest were both decidedly foreseeable events. Although the COLI plans were not prohibited by the Internal Revenue Code as it existed at the time the plans were created, there were well-known concerns about potential legal objections by the IRS to such plans under federal tax law.[42] For decades the IRS has had the power to look beyond the form of a transaction to its economic or business purpose. When a transaction exploits a feature of the tax code without the attendant economic risk, the IRS may label the transaction a sham and disallow the tax benefits claimed by the taxpayer.[43] All taxpayers considering the use of a tax shelter to avoid tax liability are in a position to foresee that the IRS might determine that the desired tax benefits are unavailable. This is especially true when the taxpayer is one of the largest, most sophisticated companies in the world and is trying to avoid hundreds of millions of dollars in taxes.

There was also an obvious and known risk that Wal–Mart would be found to lack an insurable interest in the lives of its rank-and-file employees. Wal–Mart used a Georgia trust to purchase the policies specifically to take advantage of Georgia law that allowed it to have an insurable interest in its employees.[44] To make such a decision, Wal–Mart must have been aware that other states (such as Texas) do not allow employers to have an insurable interest in their employees. Given that knowledge, the risk of a court in such a

40. Am. Compl. ¶ 3.

41. *Id.* ¶ 7.

42. "From the beginning of its exploration of COLI plans, Wal–Mart recognized that continued favorable tax treatment was essential to the viability of the plans." Am. Compl. ¶ 40.

43. *Neonatology Assocs., P.A. v. Comm'r,* 299 F.3d 221, 231 n. 12 (3d Cir.2002) (citing *Horn v. Comm'r,* 968 F.2d 1229, 1236 n. 8 (D.C.Cir. 1992)); see also *Higgins v. Smith,* 308 U.S. 473, 477–78, 60 S.Ct. 355, 84 L.Ed. 406 (1940) ("The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a **sham** may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation.").

44. *Id.* ¶ 37.

state applying its own law and finding that Wal–Mart did not have an insurable interest in its employees was eminently foreseeable.

Wal–Mart's awareness of, and concern about, these risks is reflected in the very application it filed for the AIG policies. Wal–Mart and AIG executed a Letter of Understanding as part of that application process that specifically addresses Wal–Mart's concerns with "the tax consequences of loans and/or withdrawals from the Policies and the deductibility thereof." [45] An exhibit to this letter deals with the possibility that Wal–Mart might be found to lack an "insurable interest" in the lives of its employees.[46]

To avoid this outcome, Wal–Mart cites two Ninth Circuit Court of Appeals decisions allowing rescission of a tax shelter contract because the tax avoidance purpose of the transaction was frustrated.[47] However, the Ninth Circuit based both decisions on the fact that the contracts involved in those cases allocated the risk of an adverse tax ruling to the defendants. In *Mayer*, based on Oregon's doctrine of commercial frustration, stockholders were excused from performance of an agreed-upon stock transfer after an IRS ruling which rejected the tax premise upon which the stock transfer was based.[48] The Ninth Circuit stated:

> The [District C]ourt credited testimony that [the taxpayer] did not accept the default provisions as adequate protection against an adverse tax ruling but requested assurances that the property

would be returned if the tax assumptions underlying the transaction were challenged, and that he was given such assurances by representatives of the Institute. In the light of these circumstances, it would be untenable to conclude that the parties intended that the [taxpayers] should assume the risk of an adverse tax ruling. . . . [49]

In *Walker*, the court sustained the rescission of certain annuity loan transactions on the ground of commercial frustration after a Supreme Court decision eliminated the tax benefits of the contract. The court in *Walker* recognized that no claim for frustration exists when there is risk allocation in the contract, but did not reach the issue because the insurer did not raise it at trial. "[T]he general rule is that this Court will not reverse the trial court on a contention that was never presented to it." [50]

In contrast, Wal–Mart does not allege facts from which this court could reasonably infer that the parties to the COLI contracts ever agreed to shift the risk of an adverse tax ruling, or an adverse ruling as to Wal–Mart's insurable interest in its employees, onto the defendants. In fact, the opposite is true. As discussed above, the Letter of Understanding clearly places the risk of loss, vis-à-vis the insurable interest, on Wal–Mart. Furthermore, the contract is silent as to the risk of loss with respect to an adverse tax ruling. Absent a contractual provision shifting the risk of

---

45. Letter of Understanding at 2, Ex. 1 to Def.'s Joint Supplemental Br.

46. *Id.*

47. *Walker v. Cont'l Life & Accident Co.*, 445 F.2d 1072 (9th Cir.1971); *W. L.A. Inst. for Cancer Research v. Mayer*, 366 F.2d 220 (9th Cir.1966).

48. *Id.* at 225–26.

49. *Id.*

50. *Walker*, 445 F.2d at 1074 (citations omitted).

loss, the risk clearly remained where it began—with the taxpayer, Wal–Mart.[51]

Moreover, to the extent that these Ninth Circuit cases can stand for the broader proposition that commercial frustration allows a party to rescind a contract, they are of doubtful continuing vitality. The doctrine of commercial frustration has developed relatively recently, as an offshoot of the more established doctrine of impossibility. The decisions in *Mayer* and *Walker* are early decisions, and contradict the overwhelming weight of modern authority that restricts commercial frustration to excusing failure of future performance.[52] These cases also contradict more modern cases from the same jurisdiction.[53]

In addition, allowing rescission of contracts due to commercial frustration would interfere with the valid expectations of parties to commercial transactions. The proper way to allocate risks in a contract is through bargaining between parties. It is not the court's role to rewrite the contract between sophisticated market participants, allocating the risk of an agreement after the fact, to suit the court's sense of equity or fairness. Given the additional fact that, even as a defense, the doctrine is disfavored, the court holds that the doctrine of commercial frustration in Delaware only functions to excuse future performance of a contract, at least among sophisticated parties, and cannot serve as a basis to reallocate known, or obviously foreseeable, risk of loss post-contractually.

The court finds that the doctrine of commercial frustration is inapplicable and the written contracts govern the dispute between the parties. The court must therefore dismiss Wal–Mart's claim for unjust enrichment.

## B. Breach Of Fiduciary Duty

Wal–Mart's second claim is for breach of fiduciary duty. Fiduciary relationships have often been described as "special relationships," for good reason. Generally, "[a] fiduciary relationship is a situation where one person reposes special trust in another or where a special duty exists on the part of one person to protect the interests of another."[54] A fiduciary relationship implies a dependence, and a condition of superiority, of one party to another.[55] A fiduciary relationship exists where one party places a special trust in another and relies on that trust, or where a special duty exists for one party to pro-

51. The court made essentially the same point in its earlier opinion. *Wal–Mart*, 2004 WL 405913, at *6 n. 53, 2004 Del. Ch. Lexis 19, at *27 n. 53. The Delaware Supreme Court expressly acknowledged and left undisturbed this finding. *See Wal–Mart*, 860 A.2d at 318 n. 13.

52. *See, e.g., Voyager,* 1996 U.S. Dist. Lexis 14447, at *5 ("Here, Voyager is not using the doctrine of frustration of purpose to excuse performance. Rather, Voyager is attempting to use the doctrine to compel HMW to pay an additional $250,000 for the radio stations. The doctrine, however, is a shield, not a sword."); *Plitt Theatres,* 1999 WL 281085, at *3, 1999 U.S. Dist. Lexis 7785, at *9 (characterizing commercial frustration as a viable defense, albeit a disfavored one, to a breach of contract claim); *Sage Realty,* 1997 WL 370786, at *2, 1997 U.S. Dist. Lexis 9301, at *6 (stating that commercial frustration operates to discharge duties under a contract).

53. *See FDIC v. Sahni,* 1997 WL 51454, 1997 U.S.App. Lexis 2058, at *7 (9th Cir. Feb. 5, 1997) (characterizing commercial frustration as a defense to a breach of contract claim); *Peoplesoft,* 227 F.Supp.2d at 1119 (same).

54. *Cheese Shop Int'l, Inc. v. Steele,* 303 A.2d 689, 690 (Del.Ch.1973), *rev'd on other grounds,* 311 A.2d 870 (1973).

55. *Lank v. Steiner,* 213 A.2d 848, 852 (Del.Ch. 1965); *Peyton v. William C. Peyton Corp.,* 7 A.2d 737, 747 (Del.1939).

tect the interests of another.[56] It generally requires "confidence reposed by one side and domination and influence exercised by the other."[57]

The Delaware courts have been reluctant to extend too broadly the applicability of fiduciary duties. As Justice (then-Vice Chancellor) Jacobs stated:

> Our courts have been cautious when evaluating entreaties to expand the number and kinds of relationships that are denominated as "fiduciary" .... [A] special relationship must exist between the parties, but the term "special relationship" cannot "be thought to describe too broadly chancery's concerns with relationships where an element of trust, as commonly understood, is present. One may place trust in a workman of any sort and does place trust in one's physician, but it would hardly be contended that such trust would warrant chancery's assuming jurisdiction over a claim that a workman or physician caused injury by want of due care."[58]

Furthermore, while some cases in Delaware have found certain aspects of a commercial relationship to implicate fiduciary duties, these cases should not be read so broadly as to engulf in fiduciary duties ordinary commercial relationships. For instance, in *O'Malley v. Boris*, the Delaware Supreme Court held that a stockbroker was liable to his client for breach of fiduciary duties when the broker had engaged in self-dealing with the client's money.[59] The Court relied upon *NYSE v. Pickard & Co.*,[60] in which former Chancellor Duffy stated that a stockbroker/client relationship is often a principal/agent relationship, thereby giving rise to certain particularized fiduciary duties. As Chancellor Duffy said:

> Speaking generally, the position of a stockbroker is often twofold:
>
> (a) when he buys or sells a security upon the order of a customer he is the agent of that customer in that transaction; (b) when he provides his own money to complete the order by paying for the security he is a principal *vis-a-vis* the customer in that phase of the transaction. As an agent he owes a fiduciary duty to his customer; as a principal he is a creditor of the customer, holding the security purchased as collateral for the debt (i.e., with a lien thereon) and the relationship is thus that of pledgor and pledgee. The pledge relationship applies equally to securities deposited by a customer with a broker as part of a marginal transaction, or to secure purchase of other securities on margin.[61]

Instructively, the former Chancellor looked at the particular circumstances of the stockbroker/client relationship in determining whether, and to what extent, a fiduciary relationship existed.

This court is similarly mindful that, in examining whether (and to what extent) a relationship may be alleged to have involved fiduciary relations, the reliance on

---

56. *Goodrich v. E.F. Hutton Group, Inc.*, 1991 WL 101367, at *1, 1991 Del. Ch. Lexis 93, at *3 (Del.Ch.1991); *Cheese Shop*, 303 A.2d at 690.

57. *BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *8, 2004 Del. Ch. Lexis 119, at *39 (Del.Ch. Aug. 3, 2004) (quoting *Gross v. Univ. of Chi.*, 14 Ill.App.3d 326, 302 N.E.2d 444, 453–54 (1973)).

58. *Bird's Constr. v. Milton Equestrian Ctr.*, 2001 WL 1528956, at *4, 2001 Del. Ch. Lexis 140, at *13–*14 (Del.Ch. Nov. 16, 2001) (quoting *McMahon v. New Castle Assocs.*, 532 A.2d 601, 604 (Del.Ch.1987)).

59. 742 A.2d 845, 849 (Del.1999).

60. 274 A.2d 148, 150 (Del.Ch.1971).

61. *Id.*

labels is inappropriate. Because the alleged factual circumstances of Wal–Mart's dealing with the Insurers and the broker-defendants are different, the court addresses them separately.

### 1. *Fiduciary Duty Claims Against The Insurers*

It is settled law that an insurer does not generally owe a fiduciary duty to its insured because this relationship is usually an arm's-length contractual relationship.[62] In *Crosse*, the Delaware Supreme Court held that even the additional fact that the insurer was a not-for-profit organization that operated for the benefit of its policyholders did not give rise to fiduciary duties.[63] The Supreme Court stated: "the concept of a fiduciary relationship, which derives from the law of trusts, is more aptly applied in legal relationships where the interests of the fiduciary and the beneficiary incline toward a common goal in which the fiduciary is required to pursue solely the interests of the beneficiary in the property." [64] It next explained that an insurance policy does not give rise to fiduciary duties "because the interests of the plan participants and those of [the insurer] are not perfectly aligned." [65]

■■■■■ Wal–Mart argues that, in this case, the COLI "relationship" is a "partnership" or "joint venture," thereby giving rise to fiduciary duties. In support of this proposition, Wal–Mart cites only *American Electric*,[66] which merely quotes an insurance broker as describing COLI poli-

cies as a "partnership." However, the court in *American Electric* does not hold that COLI plans are a partnership and Wal–Mart cites no cases holding that COLI plans are some super-contractual "partnership" arrangement. Instead, the law is clear that the insurer/insured relationship is one of contract that does not give rise to a fiduciary relationship.[67] Here, as in most cases between insurer and insured, the relationship between Wal–Mart and the Insurers is a straightforward commercial relationship arising from contract. It is in all of its aspects an arm's-length relationship. It involves no element of confidentiality, joint undertaking, or trust and dependence.

Since Wal–Mart alleges no facts from which the court could infer that the relationship between it and the Insurers was anything but an arm's-length business relationship, the court must dismiss the fiduciary duty claim against the Insurers.

### 2. *Fiduciary Duty Claims Against The Broker–Defendants*

■■■ Wal–Mart alleges that it hired the broker-defendants to advise it in the potential purchase of COLI policies based on their self-professed expertise and experience in the COLI field.[68] It alleges that the broker-defendants designed the COLI policies for Wal–Mart, solicited proposals from insurance companies involved in COLI plans, selected the insurance companies to underwrite the COLI plans, and negotiated the terms and conditions of the

---

**62.** *Crosse v. BCBSD, Inc.,* 836 A.2d 492, 497 (Del.2003); *see also Corrado Bros. v. Twin City Fire Ins. Co.,* 562 A.2d 1188, 1192 (Del. 1989).

**63.** 836 A.2d at 497.

**64.** *Id.* at 495 (quoting *Corrado Bros.,* 562 A.2d at 1192).

**65.** *Crosse,* 836 A.2d at 495.

**66.** 136 F.Supp.2d at 777.

**67.** *Corrado Bros.,* 562 A.2d at 1192; *Abex Inc. v. Koll Real Estate Group, Inc.,* 1994 WL 728827, at *16, 1994 Del. Ch. Lexis 213, at *46–*47 (Del.Ch. Dec. 22, 1994).

**68.** Am. Compl. ¶ 30.

insurance policies for Wal–Mart.[69] Wal–Mart also alleges that it relied upon the assurances and expertise of the broker-defendants. It does not allege, however, that the broker-defendants were empowered to purchase the policies on Wal–Mart's behalf or otherwise engaged in self-dealing with Wal–Mart's property.

The question presented on this motion to dismiss is whether these allegations of fact are sufficient to support an inference that a fiduciary relationship arose between Wal–Mart, one of the nation's largest, most successful corporations, and the defendant insurance brokers. The court is mindful of the fact that normal business dealings (such as that of an insurance broker and its client) can sometimes take on certain aspects of a fiduciary relationship, as, for example, where the broker agrees to act as agent for the customer with power to bind the customer contractually.[70] At the same time, however, for the reasons described by Justice Jacobs in *Bird's Construction,*[71] it is vitally important that the exacting standards of fiduciary duties not be extended to quotidian commercial relationships. This is true both to protect participants in such normal market activities from unexpected sources of liability against which they were unable to protect themselves and, perhaps more important, to prevent an erosion of the exacting standards applied by courts of equity to persons found to stand in a fiduciary relationship to others.

In this light, while Wal–Mart alleges that it placed trust in the broker-defendants, it does not allege sufficient facts that, if proven to be true, demonstrate that its relationship with the broker-defendants went beyond that occurring in normal commercial transactions, or otherwise justify imposing on the broker-defendants the scrupulous obligations of fiduciaries. On the contrary, the facts that are apparent from the face of the Amended Complaint show that Wal–Mart's relationship with the broker-defendants was an ordinary commercial relationship and not a fiduciary relationship.

First, there is no alignment of interests between Wal–Mart and the broker-defendants as there was no "common goal" of the COLI plans.[72] Wal–Mart was trying to avoid paying the taxes it owed, while the broker-defendants were trying to make money by brokering the sale of the COLI policies to Wal–Mart and entering into contracts with Wal–Mart to service those contracts.

Second, Wal–Mart does not allege any facts from which the court could reasonably infer that the broker-defendants exerted control or domination over Wal–Mart.[73] Wal–Mart does not allege that it was coerced by the broker-defendants to purchase the COLI policies. On the contrary, it is evident from the Amended Complaint that Wal–Mart made the decision to purchase the COLI policies on its own, and *sought out* the broker-defendants to facilitate those purchases.[74] Moreover,

69. *Id.*

70. *See, e.g., Pickard,* 274 A.2d at 150.

71. *2001 WL 1528956,* at *4, 2001 Del. Ch. Lexis 140, at *13–*14.

72. *Crosse,* 836 A.2d at 495.

73. *Lank,* 213 A.2d at 852.

74. Am. Compl. ¶ 29 ("Like many companies in the early 1990s, Wal–Mart began exploring ways to adapt to changes in accounting for and funding health and death benefits for its associates.... Accordingly, in or about August 1993, Wal–Mart's director of benefits design, Thomas Emerick, selected the broker defendants ... to *advise* Wal–Mart in connection with the *potential purchase* of broad based COLI plans ....") (emphasis added).

as counsel for Wal–Mart candidly admitted at oral argument, Wal–Mart sought the advice of its own legal and financial advisors before purchasing the COLI policies. In addition, the broker-defendants acted only as advisors to Wal–Mart; they had no power to purchase COLI policies on Wal–Mart's behalf.[75] In light of these circumstances, the court is unwilling to infer for the purposes of this motion to dismiss that Wal–Mart, one of the largest, most sophisticated companies in the world, advised by its own professionals, so "depended" on the broker-defendants as to invoke this court's equitable powers to regulate relationships between fiduciaries and their *cestui que trusts.*

Third, Wal–Mart does not allege facts from which the court could infer self-dealing.[76] The broker-defendants did not have the *power* to engage in self-dealing. Again, Wal–Mart does not allege that the broker-defendants could do anything except *advise* Wal–Mart on the purchase of the COLI policies.

In sum, the relationship that is alleged to have existed between Wal–Mart and the broker-defendants was merely a normal, arm's-length business relationship. The facts that there were hundreds of millions of dollars at stake and that there were substantial known risks posed by principles of both tax and insurance law do not transform this commercial relationship into one based on fiduciary duties. In the end, Wal–Mart cannot show the existence of a fiduciary relationship by alleging simply that it relied on or "trusted in" the assurances and expertise of the broker-defendants. To rule otherwise would

threaten to interject the law of fiduciary duty into a wide range of ordinary commercial relationships generally understood to be governed by the norms of the marketplace, not the scrupulous concerns of equity for persons in special relationships of trust and confidence.

For these reasons, the court dismisses Wal–Mart's claim for breach of fiduciary duty against the broker-defendants.

## C. *Equitable Fraud*

Wal–Mart's third claim is for equitable fraud. Wal–Mart alleges that an agent of Hartford provided Wal–Mart with detailed cash flow and earnings illustrations depicting annual tax savings and annual positive cash flows.[77] Wal–Mart also alleges that the Insurers made specific assurances that the COLI plans were compliant with the Internal Revenue Code.[78] In addition, Wal–Mart alleges that all the defendants failed to disclose material information regarding the COLI plans, even though they had a duty to disclose this information.[79]

Common law fraud in Delaware requires that: (1) a false representation, usually one of fact, made by the defendant, exists; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance.[80] In addition to

---

**75.** Am. Compl. ¶ 29.

**76.** *See O'Malley,* 742 A.2d at 849 (holding that a stockbroker violated his fiduciary duties to his client by engaging in self-dealing).

**77.** Am. Compl. ¶ 35.

**78.** Am. Compl. ¶¶ 40–41.

**79.** Am. Compl. ¶ 80.

**80.** *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del.1983).

overt representations, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.[81] To state a claim for equitable fraud under Delaware law, a plaintiff must satisfy all the elements of common law fraud with the exception that the plaintiff need not demonstrate that the misstatement or omission was made knowingly or recklessly.[82] However, equitable fraud does not swallow common law fraud because it can only be applied in those cases in which one of the two fundamental sources of equity jurisdiction exists: (1) an equitable right founded upon a special relationship over which equity takes jurisdiction, or (2) where equity affords a special remedy (e.g. rescission or cancellation).[83]

Wal–Mart's allegation that the Insurers assured it that the COLI plans were compliant with the Internal Revenue Code does not state a claim upon which relief can be granted. It is an opinion as to a matter of law. A misrepresentation as to a matter of law is a statement of opinion only and cannot afford a basis for a charge of fraud or deceit in the making of the contract.[84] This is because all persons are presumed to know the law and therefore cannot be deceived by erroneous statements of law.[85]

With respect to Wal–Mart's allegations that the illustrations of cash flow were false, this is not a "fact" actionable for fraud. The law has always been skeptical about grounding fraud claims in projections of future events for the obvious reason that the fact that a prediction might not come true does not mean the projection was not made in good faith and also because it is unreasonable to place much weight on such statements.[86] Moreover, the cash flow projections alleged in Wal–Mart's complaint were made on the assumption, held by all parties at the time, that the loans payments on the COLI polices would be tax deductible. This assumption proved false. But the Amended Complaint does not allege, and it is not reasonable to infer, that the Insurers knew their projections were incorrect or acted to deceive Wal–Mart. Therefore, the cash flow projections cannot be the basis for a claim of fraud.

Wal–Mart's allegation that the defendants committed fraud through silence is only viable if the defendants had a duty to speak. As discussed, *supra*, the Insurers and the broker-defendants did not owe fiduciary duties to Wal–Mart. They, therefore, had no duty to speak and this claim should be dismissed.

### D. Breach Of Contract

Wal–Mart's fourth claim is for breach of contract. Wal–Mart alleges that all defendants breached the express terms of the COLI policies and breached the duty of fair dealing implicit in every contract. Wal–Mart asserts that the agreement

81. *Id.*

82. *Id.*

83. *U.S. WEST, Inc. v. Time Warner Inc.*, 1996 WL 307445, at *26, 1996 Del. Ch. Lexis 55, at *83 (Del.Ch. June 6, 1996).

84. *Lakeside Invs. Group, Inc. v. Allen*, 253 Ga.App. 448, 559 S.E.2d 491, 493 (2002); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 554 (Del.Ch.2001) ("Predic-

tions about the future cannot give rise to actionable common law fraud. Nor can expressions of opinion.") (citations omitted).

85. *Lakeside*, 559 S.E.2d at 493.

86. *See Consol. Fisheries Co. v. Consol. Solubles Co.*, 112 A.2d 30, 37 (Del.1955) ("[M]ere expressions of opinion as to probable future events, when clearly made as such, cannot be deemed fraud or misrepresentations."); *Great Lakes*, 788 A.2d at 554.

placed the risk on the defendants that the contract's basic objective would be achieved. In addition, Wal–Mart claims that the defendants acted in bad faith by making both misrepresentations and material omissions in connection with the purchase of the COLI policies.

None of these claims is legally sufficient. First, Wal–Mart does not cite a specific provision of the contract that places the risk of loss on the defendants. In fact, Wal–Mart makes scant reference to any actual contract provision in support of its "breach of contract" claim. This is for good reason—the contract specifically places the risk of loss, at least for the lack of an insurable interest in its employees, on Wal–Mart. The Letter of Understanding states that:

> As part of its application for coverage ... Wachovia Bank of Georgia, N.A., as Trustee of the Wal–Mart Stores Inc. Corporation Grantor Trust ("Client"), a trust established in Georgia for the benefit of Wal–Mart Stores, Inc., hereby certifies the following: ... Client has an insurable interest in each of the employees named on the final list census listing ... *Client understands and agrees that [the Insurer] neither warrants nor represents that insurable interest exists.* (Emphasis added).

Similarly, there is no express provision alleged in any contract shifting the risk of loss on the tax issues from Wal–Mart (the taxpayer) to any of the defendants.

■ Second, "to state a claim for breach of an implied covenant of good faith and fair dealing, a plaintiff must identify a specific implied contractual obligation." [87] Wal–Mart fails to do so. In addition, at the time the alleged misrepresentations and omissions were made, there was no contractual relationship between the parties. Therefore, the court must dismiss Wal–Mart's claim that the alleged misrepresentations or omissions made in connection with the sale of the COLI policies violated a contractually based "implied covenant." [88]

### E. *Professional Negligence*

■ Wal–Mart's fifth claim is for professional negligence against the broker-defendants. To state a claim for negligence, a plaintiff must allege: (1) that the defendant owed the plaintiff a duty of care; (2) that the defendant breached that duty; and (3) that the defendant's breach was the proximate cause of the plaintiff's injury. [89]

At root, Wal–Mart's claim for professional negligence is dependent on its claim that a fiduciary relationship existed be-

---

**87.** *Moore Bus. Forms v. Cordant Holdings Corp.*, 1995 WL 662685, at *8, 1995 Del. Ch. Lexis 134, at *23 (Del.Ch. Nov. 2, 1995).

**88.** *See Sanders v. Devine*, 1997 WL 599539, at *6, 1997 Del. Ch. Lexis 131, at *19 (Del. Ch. Sept. 24, 1997) (holding that since there was no contractual relationship between the plaintiff and any of the defendants, allegations that the alleged misrepresentations or omissions made in connection with the formation of the contract violate the covenant of good faith "does not bear analysis.").

**89.** *New Haverford P'ship v. Stroot*, 772 A.2d 792, 798 (Del.2001). Delaware case law is silent as to whether insurance brokers are "professionals" for malpractice purposes and other States are divided on this issue. *See, e.g., Chase Sci. Research, Inc. v. NIA Group, Inc.*, 96 N.Y.2d 20, 725 N.Y.S.2d 592, 749 N.E.2d 161, 167 (2001) (stating that New York does not recognize suits for professional misconduct against insurance agents and brokers); *Flemens v. Harris*, 323 Ark. 421, 915 S.W.2d 685, 688 (1996) (applying the statute of limitations for professional malpractice to an insurance agent). This issue is relevant because "professionals" are held to a higher standard of care, and expert testimony is required in a malpractice case.

tween it and the broker-defendants and fails for that reason. In the Amended Complaint, Wal–Mart alleges that "[t]he broker-defendants owed Wal–Mart the highest duties of care, including a duty of good faith, a duty of full disclosure, a duty of loyalty, and a duty to meet the exacting standards of their respective professions." [90] These allegations do not state a claim for mere negligence. The Amended Complaint alleges that the broker-defendants negligently failed to disclose material information regarding the COLI plans, even though they had a duty to disclose this information. [91] However, generally, there is no duty to speak and, as discussed *supra*, the broker-defendants did not owe Wal–Mart fiduciary duties. Therefore, Wal–Mart's negligence claims must fail as a matter of law.

## F. *The Delaware Consumer Fraud Act*

■ Wal–Mart's sixth claim is for violation of the Delaware Consumer Fraud Act, 6 *Del. C.* §§ 2511–2526. In most respects, the Consumer Fraud Act must be interpreted in light of established common law definitions and concepts of fraud and deceit. [92] Therefore, the discussion of Wal–Mart's equitable fraud claim, *supra*, is equally applicable here. However, claims under the Delaware Consumer Fraud Act do differ in several ways from the traditional legal and equitable actions sounding in fraud. Most important, relief can only be granted under the Consumer Fraud Act

for unlawful practices occurring or performed partly or wholly within Delaware. [93] Wal–Mart does not allege any facts which, if true, could constitute unfair or deceptive conduct occurring within Delaware. There are no allegations that any misrepresentations were made in Delaware or that the COLI policies were contracted in Delaware. In fact, the Amended Complaint specifically states that the policies were purchased in Georgia, by a trust Wal–Mart organized under Georgia law. [94] Because no transaction occurred in Delaware, the Delaware Consumer Fraud Act cannot apply. Therefore, Wal–Mart's claims based on the Delaware Consumer Fraud Act must be dismissed.

## G. *Declaratory Relief*

■ Wal–Mart's seventh claim is for a declaratory judgment that the defendants are responsible for future losses incurred through the failure of the COLI plans. The purpose of the statute on declaratory judgments is to afford relief from uncertainty with respect to rights. [95] A court will, however, exercise its discretion to grant declaratory relief when the benefit outweighs the risk of premature judgment. [96] Declaratory judgment is appropriate only if there is an actual controversy between the parties. [97] One of the determining factors is the dispute's ripeness for adjudication. [98] If future events may obviate the need for declaratory relief, then

---

**90.** Am. Compl. ¶ 105.

**91.** Am. Compl. ¶ 80.

**92.** *Stephenson*, 462 A.2d at 1074.

**93.** *Goodrich v. E.F. Hutton Group, Inc.*, 542 A.2d 1200, 1203 (Del.Ch.1988).

**94.** Am. Compl. ¶¶ 37–38.

**95.** 10 *Del. C.* § 6512; *Dana Corp. v. LTV Corp.*, 668 A.2d 752, 755 (Del.Ch.1995).

**96.** *Id.*

**97.** *Stroud v. Milliken Enter., Inc.*, 552 A.2d 476, 479 (Del.1989).

**98.** *Schick Inc. v. ACTWU*, 533 A.2d 1235, 1238 (Del.Ch.1987).

the dispute is not ripe, and declaratory relief should not be granted.[99]

This dispute is not ripe for adjudication. Wal–Mart, in essence, seeks indemnification in the event it has to pay the death benefits it received under the COLI policies over to the estates of its deceased employees. This is not a proper claim for declaratory relief. "Courts have declined to enter a declaratory judgment with respect to indemnity until there is a judgment against the party seeking it."[100] As such, Wal–Mart's claim for declaratory relief should be dismissed.

## V.

For the above reasons, the defendants' motion to dismiss is GRANTED. IT IS SO ORDERED.

---

99. *See, e.g., General DataComm Indus. v. Wisconsin Inv. Bd.,* 731 A.2d 818, 822 (Del.Ch. 1999) (citing *Stroud,* 552 A.2d at 479 and stating that the Declaratory Judgment Act should not to be used as a means of obtaining advisory rulings from Delaware courts).

100. *Dana Corp.,* 668 A.2d at 756 (citing *Cunningham Bros., Inc. v. Bail,* 407 F.2d 1165 (7th Cir.1969)).