**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

HASH ASSET MANAGEMENT LTD., )
)
           Plaintiff, )
)
      v. )   C.A. No. 2025-0374-BWD
)
DMA LABS, INC., ICHI )
FOUNDATION, NICK POORE, )
BRYAN GROSS, TYLER CHRISTIAN )
PINTAR, and JULIAN BRAND a/k/a )
JULIAN FINCH-BRAND, )
)
          Defendants. )

**MEMORANDUM OPINION RESOLVING MOTIONS TO DISMISS**

Date Submitted: January 22, 2026
Date Decided: February 9, 2026

Daniel Griffith, WHITEFORD, TAYLOR & PRESTON LLC, Wilmington, DE; OF COUNSEL: George Benaur, BENAUR LAW LLC, New York, NY; *Attorneys for Plaintiff HASH Asset Management Ltd.*

William M. Alleman, Jr., MELUNEY ALLEMAN & SPENCE, LLC, Lewes, DE; OF COUNSEL: Aaron T. Morris, Andrew W. Robertson, William Spruance, MORRIS KANDINOV LLP, New York, NY; *Attorneys for Defendants DMA Labs, Inc., ICHI Foundation, Nick Poore, and Bryan Gross.*

Sara A. Barry and Louis F. Masi, CONNOLLY GALLAGHER LLP, Wilmington, DE; *Attorneys for Defendant Tyler Christian Pintar.*

Kevin S. Mann, CROSS & SIMON, LLC, Wilmington, DE; *Attorneys for Defendant Julian Brand a/k/a Julian Finch-Brand.*

**DAVID, V.C.**

The plaintiff in this action, a Cayman Islands investment fund, paid $16 million in stablecoin to purchase crypto tokens known as "oneTokens" issued by ICHI Foundation, staking its investment to a permissionless lending and borrowing pool hosted by nonparty Rari Capital. Just three months later, several cryptocurrency wallets engaged in a pattern of cyclical borrowing that first caused a dramatic increase, and then a dramatic decrease, in the value of oneTokens. In the span of a few days, the plaintiff lost nearly all of its investment.

The plaintiff now brings this action against the Cayman Islands foundation that issued the oneTokens, the Delaware corporation that wrote the foundation's code, and several individuals who purportedly controlled or were employed by those entities, alleging claims for fraud, breach of contract, conversion, breach of fiduciary duty, and piercing the corporate veil.

As explained below, although the plaintiff purports to bring a claim for breach of fiduciary duty, the operative amended complaint fails to allege any special relationship that could support such a claim. Similarly, the amended complaint asks the Court to pierce the corporate veil but fails to adequately allege a basis to support that request. Because the only claims supporting the Court of Chancery's exercise of subject matter jurisdiction are insufficiently pled, this action is dismissed with leave to transfer the plaintiff's legal claims to the Superior Court.

## I. BACKGROUND[1]

### A. DMA, ICHI, And OneTokens

Defendant DMA Labs, Inc. ("DMA") is a Delaware corporation that operates in the cryptocurrency space. Am. Compl. ¶ 17. Defendant Bryan Gross is DMA's founder and served as its Chief Executive Officer, while defendant Nick Poore served as Chief Technical Officer. *Id.* ¶¶ 19–20. Both Gross and Poore also served as directors on DMA's board of directors. *Id.* ¶ 20.

"Tokens" are digital assets created on a blockchain that represent assets or rights in a blockchain ecosystem. *See id.* ¶ 28. Blockchain companies develop protocols to govern the process for issuing tokens. *See id.* ¶ 38. Between June and October 2020, a protocol was launched for the issuance of a governance token called "ICHI," to be coded by DMA (the "ICHI Protocol").[2] *Id.* The ICHI Protocol contemplated deploying a decentralized autonomous organization ("DAO") to support the minting of "oneTokens," purported stablecoins—in other words, cryptocurrency intended to maintain a stable value by pegging its value to another

---

[1] The following facts are taken from Plaintiff's Amended Verified Complaint for Breach of Fiduciary Duty (the "Amended Complaint") and the documents incorporated by reference therein. Am. Verified Compl. for Breach of Fiduciary Duty [hereinafter Am. Compl.], Dkt. 16. The transcript of the oral argument held on January 22, 2026 is cited as "Tr. at __".

[2] A "governance" token gives users decision-making rights in a blockchain system. *See* Am. Compl. ¶ 44.

stable asset, such as the dollar or gold.  *Id.* ¶¶ 35, 38–39; *id.*, Ex. A at 3.  In October 2021, Gross established defendant ICHI Foundation (the "Foundation"), an independent ownerless foundation formed under the Cayman Islands Foundation Company Act,[3] to execute decisions made by the DAO in accordance with the Foundation's governance documents.  Am. Compl. ¶ 40.

At some point, defendant Julian Brand (also known as Julian Finch-Brand) worked as a Business Development Manager for the Foundation.  *Id.* ¶ 22.  The Amended Complaint describes defendant Tyler Christian Pintar as Brand's "associate."  *Id.* ¶ 21.

## B.     The Offering Documents

In late 2021, the Foundation hosted a website on which potential investors could access an offering memorandum and other materials describing ICHI and oneTokens (the "Offering Documents").  *Id.* ¶ 42.  As described in the Offering Documents, "[w]hen minting a oneToken, [users] pay $1 in value in a mixture of USD hard pegged stablecoin and the oneToken's specific native project token."  *See*

---

[3] The Cayman Islands Foundation Companies Act provides for the formation of a corporate vehicle called a "foundation" that has limited liability and separate legal existence, but does not require members that own the foundation.  *See generally* Foundation Companies Act, 2025 (Cayman Islands).

*id.*, Ex. A. at 41. The stablecoin is stored in a "Collateral Reserve" and the native project tokens are stored in a "Community Treasury."[4] *Id.* at 40.

The Offering Documents represented that a holder "could redeem a oneToken at any time" for one dollar in USD Coin,[5] less a redemption fee, "while supplies last." Am. Compl. ¶ 43; *id.*, Ex. A at 31, 38, 40 (stating oneTokens could be "Redeem[ed] for Exactly $ 1" and held "No" liquidation risk). The Offering Documents further represented that holders of oneToken would have a right to vote on control over the Treasury's contents. *See id.* at 5 ("Only the community of each individual project can govern the treasury backing its currency.").

The Offering Documents also claimed that oneTokens were protected by an "Angel Vault," a liquidity protection device that would create a protective "buy wall" to stabilize oneTokens' value.[6] *Id.* at 24–28. According to Plaintiff, however, Defendants failed to regularly update Angel Vault's code, and in practice, the Angel Vault buy wall became "easily overwhelm[ed]." Am. Compl. ¶ 48.

---

[4] The Court is aware that the structure of crypto-collateralized stablecoin is more complicated than the description above reflects but accepts the allegations in the Amended Complaint as true, as it must on a motion to dismiss.

[5] USD Coin is a stablecoin pegged to the U.S. dollar. Am. Compl. ¶ 32.

[6] A buy wall is a concentration of buy orders to create demand, thereby acting as temporary price support. Am. Compl. ¶ 6.

## C.     Plaintiff Invests In ICHI And Stakes Crypto In Rari Pool 136.

Plaintiff HASH Asset Management, Ltd. ("HASH" or "Plaintiff"), a Cayman Islands entity, first reviewed the Offering Documents in late 2021. *Id.* ¶¶ 55–56. In January 2022, Plaintiff began communicating with certain Defendants about ICHI through a Discord channel. *Id.* ¶ 56.

During those discussions, Plaintiff was offered the opportunity to invest in a permissionless lending and borrowing pool called "Rari Pool 136," hosted by nonparty Rari Capital. *Id.* ¶¶ 3, 57. To fund Rari Pool 136, investors contributed stablecoins to a liquidity pool. *Id.* ¶ 3. Borrowers who posted crypto as collateral could borrow from Rari Pool 136, and initial investors in Rari Pool 136 would earn a return when the borrowers' debts were repaid. *Id.*

Allegedly in reliance on Defendants' statements in the Offering Documents, other public documents, and private communications on Discord, Plaintiff paid $16 million in USD Coin to purchase three types of oneTokens: "oneUNI," "oneBTC," and "oneDODO." *Id.* ¶¶ 32, 43, 60. Plaintiff staked its oneTokens and other stablecoins to Rari Pool 136 to earn interest. *Id.* ¶¶ 57, 60.

## D.     Defendants Transfer The Contents Of The Collateral Reserve To Rari Pool 136 And Plaintiff Suffers Losses.

Unbeknownst to Plaintiff and other investors, in January 2022, Defendants began to divert tens of millions of dollars in investor-deposited stablecoins out of the Collateral Reserve and into Rari Pool 136. *Id.* ¶¶ 64–65.

5

In March 2022, ICHI's price began "climbing sharply." *Id.* ¶ 67. When Plaintiff raised concerns, Gross assured Plaintiff that "the buy wall remained strong and could absorb sales even at the increasingly higher prices if wallets began to liquidate their holdings" and the Foundation "would make necessary adjustments to the buy wall's parameters to ensure it remained strong." *Id.* ¶ 69.

On April 6, Defendants moved approximately $6.8 million in stablecoin from the Collateral Reserve into Rari Pool 136. *Id.* ¶ 70. The next day, several cryptocurrency wallets engaged in a pattern of cyclical borrowing, using Rari Pool 136 to drive up the price of ICHI. *Id.* ¶ 71. The wallets (1) posted ICHI as collateral in Rari Pool 136 to borrow stablecoins, (2) used the borrowed stablecoins to purchase more ICHI, driving up the price, (3) posted the newly purchased ICHI as collateral in Rari Pool 136 to borrow more stablecoins; and (4) repeated the process. *Id.* ¶ 68. Between April 7 and 8, the price of ICHI increased from $79 to $139. *Id.* ¶ 72. Meanwhile, Defendants removed the remainder of stablecoins in the Collateral Reserve—approximately $4 million in stablecoin—to Rari Pool 136. *Id.* ¶ 73.

On April 11, a cryptocurrency wallet sold $10 million in ICHI and "[t]he value of ICHI collateral in Rari Pool 136 immediately plunged." *Id.* ¶ 76. "The [ICHI] [P]rotocol began forcibly liquidating borrowers' holdings" which "set off a chain reaction of cascading liquidations, and a bank run occurred as investors raced to sell their ICHI or otherwise recover the crypto they had staked to Rari Pool 136." *Id.*

6

¶ 73. Plaintiff tried to "mitigate its damages by liquidating [its] own crypto holdings from the ICHI Protocol" but "lost approximately $16 million[,] and is now the largest holder of valueless . . . oneTokens on ICHI's network." *Id.* ¶¶ 82–83.

Defendants blamed ICHI's price volatility on market forces and third parties, insisting that there was no "rug pull" or scam and claiming that the wallet that made the initial $10 million sale was not affiliated with the Foundation. *Id.* ¶ 87. However, Plaintiff, aided by a crypto tracing expert, undertook an investigation that concluded "the key transactions which caused the collapse were executed by digital addresses linked to DMA and ICHI Foundation insiders." *Id.* ¶¶ 2, 91–92, 101.

### E.     Procedural History

On December 23, 2022, Plaintiff filed a lawsuit in the United States District Court for the District of Delaware (the "Federal Action") premised on the allegations described above, alleging claims for violations of federal securities laws, common law fraud, breach of contract, breach of fiduciary duty, and conversion. *HASH Asset Mgmt., Ltd. v. DMA Labs, Inc.*, C.A. No. 22-1633-JLH (D. Del. Mar. 28, 2025). On March 28, 2025, the Federal Action was dismissed without prejudice for lack of subject matter jurisdiction. *Id.*

On April 8, Plaintiff initiated this action through the filing of a Verified Complaint (the "Initial Complaint"). Verified Compl., Dkt. 1. The Initial Complaint alleged claims for fraud, breach of contract, conversion, breach of fiduciary duty,

and violations of federal securities laws. Verified Compl. ¶¶ 99–134. On May 2, Defendants removed the action to federal court. Dkt. 13.

Plaintiff filed the Amended Complaint, deleting its federal claims, on May 23. Am. Compl., Dkt. 16. The action was remanded, and between July 10 and 30, Defendants moved to dismiss the Amended Complaint (the "Motions to Dismiss") and filed opening briefs in support thereof. DMA Defs.' Mot. to Dismiss, Dkt. 23; Opening Br. in Supp. of DMA Defs.' Mot. to Dismiss, Dkt. 23; Def. Tyler Christian Pintar's Mot. to Dismiss the Verified Am. Compl., Dkt. 25; Def. Tyler Christian Pintar's Joinder and Opening Br. in Supp. of His Mot. to Dismiss, Dkt. 36; Def. Julian Brand's Mot. to Dismiss the Am. Verified Compl. for Breach of Fiduciary Duty, Dkt. 29; Opening Br. in Supp. of Def. Julian Brand's Mot. to Dismiss the Am. Verified Compl. for Breach of Fiduciary Duty, Dkt. 34. On August 28, Plaintiff filed an answering brief in opposition to the DMA Defendants' Motion to Dismiss. Pl.'s Answering Br. in Opp'n to Defs. DMA Labs, Inc., ICHI Foundation, Nick Poore and Bryan Gross' Mot. to Dismiss [hereinafter AB], Dkt. 37.

On September 19—before Plaintiff filed an answering brief in opposition to Brand's and Pintar's Motions to Dismiss or Defendants filed reply briefs in further support of the Motions to Dismiss—Plaintiff filed a Motion for Leave to Amend the Complaint (the "Motion to Amend"). Pl. HASH Asset Mgmt. Ltd.'s Mot. for Leave to Amend the Compl., Dkt. 38. Plaintiff's proposed Second Amended Verified

8

Complaint for Breach of Fiduciary Duty (the "Proposed Second Amended Complaint") would add claims against Pintar and Brand for aiding and abetting fraud and conversion and aiding and abetting breach of fiduciary duty, as well as a claim against all Defendants for civil conspiracy. Ex. to Pl.'s Br. in Supp. of Its Mot. for Leave to Amend Pursuant to Rules 15(a) and 15(a)(5)(A) ¶¶ 130–41, Dkt. 38.

On September 22, Plaintiff filed an answering brief in opposition to Brand's and Pintar's Motions to Dismiss. Pl.'s Answering Br. in Opp'n to Defs. Julian Brand and Tyler Pintar's Mot. to Dismiss, Dkt. 39. Defendants opposed the amendment and filed reply briefs in further support of their Motions to Dismiss between October 1 and October 13. Reply Br. in Supp. of the DMA Defs.' Mot. to Dismiss, Dkt. 40; Reply Br. in Further Supp. of Def. Julian Brand's Mot. to Dismiss the Am. Verified Compl. for Breach of Fiduciary Duty, Dkt. 44; Def. Tyler Pintar's Reply Br. in Supp. of His Mot. to Dismiss, Dkt. 47.

Defendants Pintar and Brand filed an opposition to the Motion to Amend on October 20. Defs. Tyler Pintar and Julian Brand's Joint Opp'n to Pl.'s Mot. for Leave to Amend Pursuant to Rules 15(a) and 15(a)(5)(A), Dkt. 50. Plaintiff filed a reply brief in further support of the Motion to Amend on October 31. Pl.'s Reply to Defs.' Opp'n to Mot. for Leave to Amend, Dkt. 52.

The Court heard oral argument on the Motions to Dismiss and the Motion to Amend on January 22, 2026.

## II.  ANALYSIS

### A.  The Court Of Chancery Lacks Subject Matter Jurisdiction Over Plaintiff's Claims.

Defendants have moved to dismiss the Amended Complaint on several grounds. Among their arguments, Defendants contend that the Amended Complaint's sole bases for invoking equity jurisdiction—a breach of fiduciary duty claim and a veil-piercing theory—are insufficiently pled and therefore do not support this Court's exercise of subject matter jurisdiction over Plaintiff's legal claims for fraud, breach of contract, and conversion.

"The Court of Chancery is a court of limited jurisdiction." *Yu v. GSM Nation, LLC*, 2017 WL 2889515, at *2 (Del. Ch. July 7, 2017). Title 10, Section 342 of the Delaware Code states that "[t]he Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court or jurisdiction of this State." 10 *Del. C.* § 342. This Court "maintains subject matter jurisdiction 'only when (1) the complaint states a claim for relief that is equitable in character, (2) the complaint requests an equitable remedy when there is no adequate remedy at law or (3) Chancery is vested with jurisdiction by statute.'" *Smith v. Scott*, 2021 WL 1592463, at *14 (Del. Ch. Apr. 23, 2021) (quoting *Perlman v. Vox Media, Inc.*, 2019 WL 2647520, at *4 (Del. Ch. June 27, 2019), *aff'd*, 249 A.3d 375 (Del. 2021) (TABLE)).

"Chancery jurisdiction is not conferred by the incantation of magic words." *Yu*, 2017 WL 2889515, at \*3 (quoting *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603 (Del. Ch. 1987)). Purporting to allege an equitable claim or seek equitable relief is not enough; a basis supporting equitable jurisdiction must be adequately pled. As explained below, although Plaintiff purports to bring a breach of fiduciary duty claim, the Amended Complaint fails to allege any special relationship that could support a claim for breach of fiduciary duty. Similarly, the Amended Complaint asks the Court to pierce the corporate veil but fails to adequately allege a basis to support that request.

> **1.  The Amended Complaint Fails To Allege A Special Relationship Supporting A Claim For Breach Of Fiduciary Duty.**

Count IV of the Amended Complaint alleges a claim for breach of fiduciary duty against all Defendants. "A claim for breach of fiduciary requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *P-5 GRA, LLC v. Ivankovich*, 2025 WL 1483625, at \*5 (Del. Ch. May 23, 2025) (quoting *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010)).

"Bargained-for commercial relationships between sophisticated parties do not give rise to fiduciary duties." *Addy v. Piedmonte*, 2009 WL 707641, at \*17 (Del. Ch. Mar. 18, 2009). Instead, "[a] fiduciary relationship exists where one party

11

places a special trust in another and relies on that trust, or where a special duty exists for one party to protect the interests of another." *Witmer v. Armistice Cap., LLC*, 344 A.3d 632, 655 (Del. Ch. 2025) (quoting *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 624–25 (Del. Ch. 2005), *aff'd in part, rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006)). This "generally requires confidence reposed by one side and domination and influence exercised by the other." *Id.* (quoting *Wal-Mart Stores, Inc.*, 872 A.2d at 624–25 (internal quotations omitted)). "Duties of a fiduciary character will only be imposed where the relationship or trust can be characterized as 'special;' fiduciary duties will not be imposed in the midst of typical arms-length business relationships." *Id.* (quoting *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1058 (Del. Super. 2001)).

"Fiduciary duties arise from the separation of ownership and control. The essential quality of a fiduciary is that she controls something she does not own." *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *40 (Del. Ch. May 6, 2021) (footnote omitted). "Traditional corporate fiduciaries like officers, directors, and controlling stockholders control a corporation that stockholders own, and so owe fiduciary duties." *Witmer*, 344 A.3d at 655. "From there, where control is separated from ownership, 'Delaware law has acknowledged various relationships as proper fiduciary relationships, for example: attorney and client, general partners, administrators or executors, guardians, and principals and their

12

agents.'" *Id.* at 655–56 (quoting *Bird's Constr. v. Milton Equestrian Ctr.*, 2001 WL 1528956, at *4 (Del. Ch. Nov. 16, 2001)).

The Amended Complaint fails to plead facts supporting an inference of a special relationship between Plaintiff and any individual defendant. Beginning with Brand and Pintar, the Amended Complaint alleges that Brand worked as a "Business Development Manager" for the Foundation, without any factual allegations explaining what that position entails, and that Pintar was Brand's "associate." Am. Compl. ¶¶ 12, 21–22. Those allegations are insufficient to support an inference that either Brand or Pintar owed fiduciary duties to Plaintiff.

As for Poore and Gross, the Amended Complaint alleges that they both "solicited [Plaintiff] to invest in the ICHI Protocol," and that Gross acted as a self-appointed "[s]teward" of ICHI, without factual allegations explaining what that means[7]; told Plaintiff he could "influence 20% of the votes of governance tokens"; and "made proposals and called for investors to vote on the same." *Id.* ¶¶ 59, 121(d)–(f). None of those allegations support an inference that Gross or Poore had interests aligned with Plaintiff, controlled property for the benefit of Plaintiff, or otherwise occupied a position of trust sufficient to transform the parties' relationship

---

[7] At oral argument, Plaintiff's counsel argued that Gross acted as the "Network Steward" of ICHI, but could not explain what that means, suggesting only that "[w]e'll have to ask Mr. Gross during discovery what he meant by being a network steward." Tr. at 60:13–19.

from a commercial arrangement to a fiduciary one.  *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 114 (Del. 2006) ("[I]t is vitally important that the exacting standards of fiduciary duties not be extended to quotidian commercial relationships."); *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 850 (Del. Ch. 2012) ("Equity distinguishes fiduciary relationships from straightforward commercial arrangements where there is no expectation that one party will act in the interests of the other."), *aff'd*, 59 A.3d 1206 (Del. 2012).

Plaintiff's fiduciary allegations primarily rely on group pleading, asserting that all Defendants owed fiduciary duties because "Plaintiff entrusted its cryptocurrency to Defendants" with the expectation that they "would act in Plaintiff's best interests"; "Defendants enjoyed discretionary power over the operation of the ICHI Platform and the disposition of cryptocurrency deposited there"; and "[a]n information asymmetry existed between Defendants and Plaintiff as to the operation and integrity of the ICHI Platform."  Am. Compl. ¶ 121(b)–(c).  Plaintiff claims that "[c]ourts around the country have held that crypto-lending protocols and its partners owe various duties to its investors, constituting a special relationship between them."  Pl.'s Answering Br. in Opp'n to Defs. Julian Brand and Tyler Pintar's Mot. to Dismiss at 26.  As support, Plaintiff cites *Fabian v. LeMahieu*, 2019 WL 4918431 (N.D. Cal. 2019), a decision in which the United States District

Court for the Northern District of California *dismissed* breach of fiduciary duty claims premised on conclusory allegations similar to those pled here:

> [P]laintiff asserts that [the] Defendants' "custodianship" over plaintiff's and the proposed class' [crypto token] investments, through their control over [a cryptocurrency exchange] and absolute control over essentially every aspect of [the crypto token] and its value, including its continued existence, created a special relationship giving rise to a fiduciary duty to plaintiff and the proposed class. In this regard, the [complaint] baldly alleges that [the] Defendants' "significant control creates a special relationship giving rise to a fiduciary duty[.]" Such "conclusory allegations of law . . . are insufficient to defeat a motion to dismiss." Plaintiff fails to provide any authority for his assertion that these allegations of custodianship suffice to state a cause of action for breach of fiduciary duty . . . .

*Id.* at \*11 (citations omitted).[8]

The allegations of the Amended Complaint here similarly fail to support an inference that any Defendant assumed a position of trust when Plaintiff purchased oneTokens issued by the Foundation, a Cayman entity governed by smart contract. Because the Amended Complaint pleads no more than an arm's-length commercial relationship (and for some Defendants, no relationship at all), Plaintiff's failed breach of fiduciary duty claim cannot support equity jurisdiction.

---

[8] Plaintiff also cites *Sarcuni v. bZx DAO*, 664 F. Supp. 3d 1100 (S.D. Cal. 2023), which does not address fiduciary duties.

### 2. The Amended Complaint Fails To Allege A Sufficient Basis To Pierce The Corporate Veil.

Plaintiff's only remaining equitable hook is Count V of the Amended Complaint, a claim for "Piercing the Veil and Alter Ego Liability." Am. Compl. ¶¶ 127–30; *see Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *5 (Del. Ch. Dec. 23, 2008) ("Under Delaware law, 'piercing the corporate veil may be done only in the Court of Chancery, when the purpose of the action is to obtain a judgment against individual stockholders or officers.'" (quoting *Eden v. Oblates of St. Francis de Sales*, 2006 WL 3512482, at *8 (Del. Super. Dec. 4, 2006))).

"Persuading a Delaware court to disregard the corporate entity is a difficult task." *Yu*, 2017 WL 2889515, at *3 (quoting *Wallace ex rel. Cencom Cable Income P'rs II, L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999)). "[B]ecause Delaware public policy does not lightly disregard the separate legal existence of corporations, a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence." *MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010). "In order to state a cognizable claim to pierce the corporate veil of [a corporate entity], plaintiffs must allege facts that, if taken as true, demonstrate the Officers' and/or the Parents' complete domination and control of the [entity]." *Wallace*, 752 A.2d at 1183–84. In determining whether veil piercing

16

is appropriate, the Court may consider "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *MicroStrategy Inc.*, 2010 WL 5550455, at *11 (quoting *EBG Hldgs. LLC v. Vredezicht's Gravenhage 109 B.V.*, 2008 WL 4057745, at *12 (Del. Ch. Sep. 2, 2008)). "While these factors are useful, any single one of them is not determinative." *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706–07 (Del. Ch. 2021). The overarching issue is whether "the corporate structure [has] cause[d] fraud or similar injustice"—in other words, whether the corporation is "a sham and exist[s] for no other purpose than as a vehicle for fraud." *Wallace*, 752 A.2d at 1184.

The Amended Complaint fails to allege any facts concerning the capitalization or solvency of DMA or the Foundation. Instead, the Amended Complaint alleges in conclusory fashion that "Defendants functioned as a single fraudulent enterprise which was used to perpetrate [a] fraudulent scheme . . . through DMA" and "siphoned off DMA and Ichi funds to the detriment of the investors in their sham offering." Am. Compl. ¶¶ 128–29. Setting aside those conclusory assertions, the *facts* pled in the Amended Complaint establish only that DMA was incorporated in Delaware and wrote code for the Foundation, a DAO governed by smart contract.

17

*Id.* ¶ 17. Those allegations fall short of showing DMA is a "sham" that exists for no purpose other than to commit fraud. *See Verdantus Advisors, LLC v. Parker Infrastructure P'rs, LLC*, 2022 WL 611274, at \*2–3 (Del. Ch. Mar. 2, 2022) (concluding rote allegations that a limited liability company "observed few if any corporate formalities," was "inadequately capitalized," "siphoned funds," and "lack[ed] assets" were "not the exceptionally rare stuff of veil-piercing").

Because Plaintiff's veil-piercing theory is insufficiently pled, it cannot be used to invoke this Court's jurisdiction.

### 3. The Court Lacks Subject Matter Jurisdiction Over Plaintiff's Claims For Fraud, Breach Of Contract, And Conversion.

Because Plaintiff's breach of fiduciary duty claim and veil-piercing theory are insufficiently pled, they do not support this Court's exercise of subject matter jurisdiction. The only claims that remain are legal claims for fraud, breach of contract, and conversion. This action is therefore dismissed with leave to transfer to the Superior Court.[9]

---

[9] Because the action is dismissed for lack of subject matter jurisdiction, the Court does not reach additional arguments for dismissal, including that the Court lacks personal jurisdiction over some Defendants.

18

## B. The Motion To Amend Is Futile.

In the midst of briefing the Motions to Dismiss, Plaintiff separately filed the Motion to Amend, seeking leave to amend the Amended Complaint.[10] Court of Chancery Rule 15 directs that "[t]he Court should freely give leave [to amend] when justice so requires." Ct. Ch. R. 15(a)(2). "Leave to amend is typically granted unless the non-moving party can establish 'undue prejudice, undue delay, bad faith, dilatory motive or futility.'" *Twitter, Inc. v. Musk*, 2022 WL 4087797, at *1 (Del. Ch. Sep. 7, 2022) (quoting *In re TGM Enters., L.L.C.*, 2008 WL 4261035, at *2 (Del. Ch. Sep. 12, 2008)).

The Motion to Amend is denied as futile. The Proposed Second Amended Complaint would add claims against Pintar and Brand for aiding and abetting breach of fiduciary duty, fraud, and conversion, as well as a claim against all Defendants for civil conspiracy. Ex. to Pl.'s Br. in Supp. of Its Mot. for Leave to Amend Pursuant to Rules 15(a) and 15(a)(5)(A) ¶¶ 130–41. Of those additional claims, the

---

[10] Defendants also argue that Court of Chancery Rule 15(a)(5)(A) prohibits amendment because "Plaintiff 'elected to respond' to the Motion to Dismiss and to stand 'on the complaint as filed'" when it filed an answering brief rather than amending its pleading. DMA Defs.' Opp'n to Pl.'s Mot. for Leave to Amend the Compl. ¶ 18, Dkt. 42 (quoting *Stern v. LF Cap. P'rs, LLC*, 820 A.2d 1143, 1144 (Del. Ch. 2003)). Because amendment would be futile, it is unnecessary to decide whether the Motion to Amend is also procedurally improper.

19

only new potential basis for equitable jurisdiction is the claim for aiding and abetting breach of fiduciary duty.

"To plead a claim for aiding and abetting breach of fiduciary duty, a plaintiff must allege (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach." *Kihm v. Mott*, 2021 WL 3883875, at \*24 (Del. Ch. Aug. 31, 2021), *aff'd*, 276 A.3d 462 (Del. 2022). Without a predicate breach of fiduciary duty, the aiding and abetting claim fails. *See, e.g.*, *In re MeadWestvaco S'holders Litig.*, 168 A.3d 675, 688 (Del. Ch. 2017) ("Because plaintiffs have failed to state a claim for breach of a fiduciary duty, their aiding and abetting claim fails for lack of a predicate breach.").

Because the Proposed Second Amended Complaint, like the operative Amended Complaint, fails to adequately allege an equitable claim sufficient to support the Court's subject matter jurisdiction, amendment would be futile. The Motion to Amend is therefore denied.

## III.   CONCLUSION

For the reasons explained above, the Amended Complaint is dismissed for lack of subject matter jurisdiction, with leave to transfer to the Superior Court pursuant to 10 *Del. C.* § 1902.

20